SCHOBER, Respondent, v. CITY OF MILWAUKEE, Appellant.

*November 30, 1962—February 5, 1963.*

For the appellant there was a brief by *John J. Fleming,* city attorney, and *Ewald L. Moerke, Jr.,* and *Harvey G. Oden-brett,* assistant city attorneys, and oral argument by *Mr. Odenbrett* and *Mr. Moerke.*

For the respondent there was a brief by *Stupar & Enich,* and oral argument by *Steve Enich* and *Reginald M. Hislop, Jr.,* all of Milwaukee.

DIETERICH, J. The record reveals the following facts: The common council of the city, pursuant to ch. 275, Laws of 1931, and amendments thereto, known as the Kline Law, commenced condemnation proceedings for the taking of property owned by Schober, located at 1235–37–39 West Walker street in the city of Milwaukee for public school playground purposes. The award of damages was confirmed by resolution of the common council on April 28, 1961. Title to the property under the act vested in the city on May 25, 1961. On May 16, 1961, Schober served a notice of appeal on the city alleging that the award of damages made by the common council was inadequate and did not constitute full compensation for the condemnation of the Schober premises. On March 9, 1962, a jury was sworn to hear testimony in the trial of the Schober appeal. The real estate involved on the date of condemnation proceedings consisted of two buildings facing Walker street, each building containing four apartments, a seven-room house in the rear, together with a two-

car garage. The city issued building, remodeling, and repair permits for the property in question in 1940, 1947, 1948, and 1949. The property was zoned for Residential C (multiple family use) which requires 1,200 square feet per family. The Schober property was 40x150 or 7,000 square feet, which would allow five family units or six apartments with a 200-square-foot variance. Schober became an owner of the property in about 1928. Schober testified that in 1930, the flats were converted into four family units. No building permit was issued at that time. From 1930 until 1961, the Schober property was taxed by the city on the basis that it consisted of nine living units.

Schober's two expert witnesses testified as to the fair market value of the real estate. Mr. Dooley testified that the real estate was worth $42,000, and Mr. Klapinski testified that the property was worth $43,000.

The city also called two expert witnesses. Mr. Holzhauer arrived at a fair market value of $32,000 as a nine-unit property. He testified that the fair market value of the Schober property as a five or six-unit property would be $26,300. The second witness, Mr. Lederer, arrived at a fair market value of $33,000 as a nine-unit property and $26,000 as a five or six-unit property.

The trial court did not determine whether the Schober property was a valid nonconforming use or whether the city was estopped from claiming that it was an illegal use because the city collected taxes and issued building permits knowing that the property was being used as a nine-unit property.

The only question submitted to the jury was, "What was the fair market value on May 25, 1961, of the property . . . ?" The jury in its verdict determined that $41,000 was the value of the property as of May 25, 1961.

The city contends that certain testimony by Schober and remarks by her counsel were inflammatory and unduly in-

fluenced the jury on Schober's behalf. Certain portions of the testimony which the city claims were prejudicial are as follows:

Counsel for Schober: "*Q.* Now you tell us how you figure this property is worth $50,000? *A.* Well, the depression set in, my husband I worked so hard to save this place, we worked steady, ride streetcar, my children almost go hungry during depression, where you going to get money, and we were struggling, we—I sell all children's insurance policy to keep up the city tax and later on we borrowed money from finance company to pay another city tax because the rent was just—you can't rent places, my husband work and I work to keep up the place and when we have tenants we can't get no rent during depression, then depression, when war started—"

Counsel for city: (Interposing) "If the Court please, I don't like to do this, very untimely to object to testimony being given in this regard, but I wish that the testimony would be only as to the value. . . ."

Counsel for Schober: "*Q.* Go ahead. *A.* And then I lost my—my son in 1945, he was killed in Germany, so then I got sick and my husband got sick, we—all that we figured this is our income. I don't even let my husband go to work after my son was killed. I say this is our income, we never go hungry as long as we keep up this place so we keep our place up to date with everything and my husband got sick and die 1954 from cancer and I really think was everything causing because we are worry and work too hard and my property today be worth $50,000, be worth even more but if I sell to city, I don't have to sell, I don't want to sell, I want my property to my old age today when I wasn't able to work. We never figure to sell our property. I told that to Mr. Kalvelage and everybody. We buy this place—"

Counsel for city: (Interposing) "I object to that testimony."

A majority of the members of the court are of the opinion that a fair reading of the above testimony leaves no doubt that

it is inflammatory and highly prejudicial. This testimony, considered together with other statements appearing in the record, such as the artless characterization of Schober's occupation by counsel as a "scrubwoman," creates a cumulative effect which can be calculated as sufficient to influence the jury. That although the trial court was diligent in its efforts to exclude prejudice from the proceedings by sustaining objections by counsel for the city and further by instructing the jury at the close of the trial to disregard certain improper testimony, this was not sufficient to negate the total cumulative effect of prejudicial evidence on the minds of the jurors. The writer disagrees with the majority of the court on this point, for the reason that, as evidenced by the transcript, objections were not always made promptly; in fact the objections interposed by the city appear to have been made reluctantly, and further the award made by the jury comes within the range of values put on the property by the expert witnesses.

The instant action is in the form of a trial *de novo* in the circuit court based upon an appeal from the award of damages made by the city pursuant to a determination by the board of assessments under the Kline Law. The only issue for the jury is damages. However, the jury, in order to arrive at its determination of fair market value, had to decide whether or not the Schober property constituted a valid nonconforming use. Allied with this issue there was also the question of whether the city was estopped from claiming an unlawful use because it permitted the nonconforming use over a period of thirty years, collected taxes on the Schober property on the basis that it contained nine units, and in addition issued building permits for remodeling and repair for the years 1940, 1947, 1948, and 1949.

On a new trial the proper procedure for the trial court to follow under the Kline Law is to decide questions of law and equity and then submit to the jury only the question of damages.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings consistent with this opinion.

CURRIE, J. (*concurring*). On this appeal appellant city advanced two grounds why there should be reversal and a new trial. The first of these was that plaintiff interjected improper matters in her testimony and her counsel made certain remarks which tended to prejudice the jury against the city and incite the jury's sympathy. The court's opinion grants a new trial on this first ground. There were further incidents other than those recounted in the opinion of which the city complains and I believe rightly so. Although some of these incidents standing alone might not be cause for a new trial, their cumulative effect in this case was disastrous from the city's standpoint and constitutes ample ground for the new trial which has been directed.

The second ground advanced by the city for a new trial relates to the illegal nonconforming use of the premises in violation of the city zoning ordinances. The question was raised on trial whether the city was estopped to raise the issue of illegal nonconforming use. Instead of ruling on this question of estoppel, the trial court left it to the jury to decide in determining the amount of damages in the verdict and permitted expert testimony on value based on the illegal nonconforming use to go into the record. The city rightfully contends that this was error and that the trial court should have disposed of the issues of illegal nonconforming use and estoppel as a matter of law. Because these issues will undoubtedly arise on the new trial that has been directed, their resolution on this appeal would appear proper for the benefit of the trial court in conducting the new trial.

Plaintiff's property could legally have been divided into five or six family units or apartments under the zoning ordinances. This zoning restriction on the number of family units or apartments was in effect in 1930 when the two double

flats were converted without the securing of a building permit from two to four family units each. Subsequently, however, in 1940, 1947, 1948, and 1949, building permits were issued for some remodeling and repairs. Thus the question arises, Is the city estopped to assert in this action the illegality of the nonconforming use of the property by its acts of issuing these building permits and collecting taxes based on an assessed valuation of the property as a nine family unit instead of a five or six family unit?

In eminent-domain cases, the damages awarded for the taking of property are to be based on its most-advantageous use. *Muscoda Bridge Co. v. Grant County* (1929), 200 Wis. 185, 190, 227 N. W. 863; *Carazalla v. State* (1955), 269 Wis. 593, 598, 70 N. W. (2d) 208, 71 N. W. (2d) 276; and *Utech v. Milwaukee* (1960), 9 Wis. (2d) 352, 358, 101 N. W. (2d) 57. Nevertheless, this rule of most-advantageous use, sometimes referred to as "highest and best use," is subject to the limitation that an illegal use cannot be considered in fixing such damages. 4 Nichols, Eminent Domain (3d ed. rev. 1962), p. 187, sec. 12.3143. Thus the illegal division of the property into nine family units cannot be considered in determining fair market value for purposes of eminent domain unless the city is estopped from raising the illegal use.

We start with the premise that zoning ordinances are enacted pursuant to the police power for the health, safety, and general welfare of the public. *State ex rel. Saveland Park Holding Corp. v. Wieland* (1955), 269 Wis. 262, 69 N. W. (2d) 217; and *State ex rel. Carter v. Harper* (1923), 182 Wis. 148, 196 N. W. 451, 33 A. L. R. 269. In *Park Bldg. Corp. v. Industrial Comm.* (1960), 9 Wis. (2d) 78, 88, 100 N. W. (2d) 571, this court quoted with approval from the annotation entitled, "Applicability of doctrine of estoppel against government and its governmental agencies," 1 A. L. R. (2d) 338, 340, as follows:

"As a general rule the doctrine of estoppel will not be applied against the public, the United States government, or the state governments, where the application of that doctrine would encroach upon the sovereignty of the government and interfere with the proper discharge of governmental duties, and with the functioning of the government, or curtail the exercise of its police power; . . ."

In the *Park Bldg. Corp. Case,* we held that estoppel might not be invoked against the industrial commission to waive the stairwell requirements in the state building code on the ground that the commission knowingly permitted the Milwaukee building inspector to waive such requirements many years prior to the time that the commission sought to enforce the code provision. Although this court has not specifically decided whether a municipal corporation such as a city may be estopped from enforcing a zoning ordinance, the same principle ought to apply. A municipality should not be precluded by the acts of any municipal officers from enforcing any ordinance enacted pursuant to the police power for the promotion of the general welfare. Authorities so holding are: *Fass v. Highland Park* (1949), 326 Mich. 19, 39 N. W. (2d) 336; *The Alexander Co. v. Owatonna* (1946), 222 Minn. 312, 24 N. W. (2d) 244; *Yonkers v. Rentways, Inc.* (1952), 304 N. Y. 499, 109 N. E. (2d) 597; and *Universal Holding Co. v. North Bergen Tp.* (1959), 55 N. J. Super. 103, 150 Atl. (2d) 44. The Nebraska court has applied this rule against estoppel with respect to an ordinance establishing setback lines. *Beatrice v. Williams* (1961), 172 Neb. 889, 112 N. W. (2d) 16. The New York court in the *Yonkers Case* stated (p. 505):

"A municipality, it is settled, is not estopped from enforcing its zoning laws either by the issuance of a building permit or by laches. (See *Rollins v. Armstrong,* 251 N. Y. 349, affg. 226 App. Div. 687; *Village of North Pelham v. Ohliger,* 245 N. Y. 593, affg. 216 App. Div. 728.)"

See also 19 Am. Jur., Estoppel, p. 820, sec. 168; 31 C. J. S., Estoppel, p. 421, sec. 142.

There is a broad area, apart from matters of the police power in which the rule against estoppel should be applied, in which estoppel may be raised against a municipal corporation such as when it engages in a proprietary as distinguished from a governmental function, or when its financial operations such as in tax matters and claims for damages are involved. In dealing with matters of police power, however, the health, safety, and general welfare of the citizens of the municipality are at stake. Thus the power of the city to act effectively to enforce ordinances which guard such safety, health, and welfare should never be precluded on the ground that some municipal officer, in plain disregard of the provisions of a zoning ordinance, may have issued a building permit many years before which authorized the improvement of the property for a use prohibited by the ordinance.