DEPARTMENT OF REVENUE, Petitioner-Appellant, v. MOE-BIUS PRINTING COMPANY, Respondent. [Case No. 76–766.]

MOEBIUS PRINTING COMPANY, Petitioner-Respondent, v. DEPARTMENT OF REVENUE, Appellant. [Case No. 76–767.]

Supreme Court

*Nos. 76–766, 76–767. Argued March 28, 1979.—Decided May 30, 1979.*

(Also reported in 279 N.W.2d 213.)

612

614

For the appellant the cause was argued by *E. Weston Wood*, assistant attorney general, with whom on the briefs was *Bronson C. La Follette*, attorney general.

For the respondent there was a brief by *Frank J. Pelisek, Gordon K. Miller* and *Michael, Best & Friedrich* of Milwaukee, and oral argument by *Mr. Pelisek*.

SHIRLEY S. ABRAHAMSON, J. The appeals are taken by the Wisconsin Department of Revenue (Department) from judgments entered by the circuit court in two sales tax proceedings involving Moebius Printing Company.

Both judgments of the circuit court are based on a single memorandum decision in which the circuit court construed ch. 77, Stats., to exempt the gross receipts from certain sales by Moebius from sales tax.

Case No. 76–766 relates to that part of the decision and order of the Wisconsin Tax Appeals Commission holding that the Department's sales tax assessment against Moebius for August 1970 was barred by a prior field audit. The Department sought review in circuit court; the circuit court affirmed the Commission. We affirm this judgment.

Case No. 76–767 relates to that part of the decision and order of the Wisconsin Tax Appeals Commission upholding the Department's sales tax assessment against Moebius for the period from September 1, 1969 to December 31, 1971 (excluding August 1970). Moebius sought review in circuit court. The circuit court reversed the Commission. We modify this judgment and remand the case to the circuit court.

## I.

Moebius is a printing and lithographing firm whose primary business is the sale of illustrated brochures, catalogs and folders which Moebius produces to special order by a four-color process. Moebius provided all the materials used in the printing involved in the sales in question and delivered all of the printed matter to its customers in Wisconsin.

In most of the sales involved in these proceedings, Moebius' customer executed a form prescribed by the Wisconsin Department of Revenue entitled "Certificate of Exemption." This form lists exemptions, which the purchaser can check, and concludes with the line: "Other purchases exempted by law. (State items and exempted use)." Moebius' customers checked this line and completed it by stating that all (or a specified percentage) of the printed materials purchased was to be distributed outside of Wisconsin. In a few of the sales involved in these proceedings, similar statements were made by the purchaser on Department "Resale Certificates" or in letters to Moebius. The Commission found that Moebius accepted these certificates in the belief that the purchases covered by these documents were exempt from the sales tax and that Moebius did not collect a sales tax on that portion of the printed material which the customers indicated would be used outside the State of Wis-

consin. These uncollected taxes are the subject matter of this dispute.

In October 1970, James Lydon, a tax representative of the Department, called at the Moebius office in Milwaukee and examined Moebius' books and records for the month of August, 1970. It appears that Moebius made available to Lydon all of its sales records from September 1, 1969, to the date of his visit. However there is no evidence that Lydon examined any records for any month other than August, 1970.

In a letter dated October 9, 1970, after the conclusion of his two-day "spot check," Lydon wrote Moebius advising Moebius that his report to the Department regarding Moebius included the following:

". . . A spot check was made of all accounts payable and all sales for the month of August 1970, list attached. For every purchase Moebius made during the period there had been either tax paid or valid exemption certificates on file. Sales for the same period was checked and again proper certificates were on file.

". . .

"In my opinion Moebius is doing an excellent all around job in compliance with the Wisconsin sales tax law."

On July 7, 1972, the Department issued a sales and use tax assessment against Moebius covering the period from September 1, 1967 through December 31, 1971 in the total amount of $33,891.36, including interest. This determination was based upon a field audit made sometime in 1972, covering the tax period from September 1, 1969 to December 31, 1971. Moebius objected to the Department's determination of its tax liability and sought a redetermination. The Department redetermined the deficiency to be $34,523.49, based on a revised audit report. Sec. 77.59 (6), Stats.

Moebius petitioned the Tax Appeals Commission for review of the action of the Department. Sec. 73.01(5),

Stats. After a hearing, the Commission concluded that the transfer for consideration of the printed materials at issue during the tax period from September 1, 1969, to December 31, 1971, constituted a sale of tangible personal property within the meaning of sec. 77.51(4)(h), Stats.;[1] that the sale was subject to sales tax under sec. 77.52(1), Stats.;[2] and that these sales were not exempt from sales tax either under sec. 77.52(2)(a)11, Stats.,[3]

[1] Sec. 77.51(4)(h), Stats., provides:

"77.51 . . .

"(4) 'Sale', 'sale, lease or rental', 'retail sale', 'sale at retail', or equivalent terms include any one or all of the following: the transfer of the ownership of, title to, possession of, or enjoyment of tangible personal property or services for use or consumption but not for resale as tangible personal property or services and includes:

". . .

"(h) A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated or printed to the special order of the customer or of any publication."

[2] Sec. 77.52(1), Stats., provides:

"77.52 **Imposition of retail sales tax.** (1) For the privilege of selling, leasing or renting tangible personal property, including accessories, components, attachments, parts, supplies and materials, at retail a tax is hereby imposed upon all retailers at the rate of 3% of the gross receipts from the sale, lease or rental of tangible personal property, including accessories, components, attachments, parts, supplies and materials, sold, leased or rented at retail in this state on or after February 1, 1962; but beginning on September 1, 1969 the rate of the tax hereby imposed shall be 4%."

[3] Sec. 77.52(2)(a)11, Stats., provides:

"(a) The tax imposed herein applies to the following types of services:

". . .

"11. The producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting. This subdivision does not apply to the printing or imprinting of tangible personal property which will be subsequently transported out-

because Moebius, not the customer, furnished the printing materials involved, or under sec. 77.54(25), Stats.,[4] because this section became effective on May 22, 1972, after the tax period here at issue. The Commission further concluded that the exemption certificates submitted by Moebius do not meet the rquirements of sec. 77.52(14), Stats., in that they do not on their face indicate a legal basis for the claimed exemption and do not relieve Moebius from the sales tax due thereon.[5] However the Commission concluded that the examination of Moebius' records in October, 1970, by Tax Representative Lydon, constituted a field audit determination of Moebius' sales tax liability for the month of August, 1970, and that the De-

---

side the state for use outside the state by the consumer for advertising purposes."

[4] Sec. 77.54(25), Stats., provides:

"77.54 **General exemptions.** There are exempted from the taxes imposed by this subchapter:

". . .

"(25) The gross receipts from the sale of and the storage of printed material which is designed to advertise and promote the sale of merchandise, or to advertise the services of individual business firms, which printed material is purchased and stored for the purpose of subsequently transporting it outside the state by the purchaser for use thereafter solely outside the state."

[5] Sec. 77.52(14), Stats., provides:

"(14) The certificate referred to in sub. (13) relieves the seller from the burden of proof only if a) taken in good faith from a person who is engaged as a seller of tangible personal property or taxable services and who holds the permit provided for in sub. (9) and who, at the time of purchasing the tangible personal property or services, intends to sell it in the regular course of operations or is unable to ascertain at the time of purchase whether the property or service will be sold or will be used for some other purpose, or b) if taken in good faith from a person claiming exemption. The certificate shall be signed by and bear the name and address of the purchaser, and shall indicate the general character of the tangible personal property or service sold by the purchaser and the basis for the claimed exemption. The certificate shall be in such form as the department prescribes."

partment was therefore barred from assessing a deficiency for that month.[6]

The circuit court held that the Commission's reading of the relevant provisions of the sales and use tax act rendered those provisions unconstitutional and that the proper construction of those provisions is that the legislature did not intend to subject to sales tax transactions such as those at issue in the case at bar. On this basis the trial court reversed the Commission's order, except for that portion barring the Department from assessing a deficiency against Moebius for August, 1970.

## II.

Moebius and the Department agree the transactions at issue are "sales" and are taxable under sec. 77.52(1), Stats., (see note 2) unless an exemption provision applies.

---

[6] Sec. 77.59(2), Stats., provides:

"(2) The department may, by field audit, determine the tax required to be paid to the state or the refund due to any person pursuant to this subchapter. The determination may be made upon the basis of the facts contained in the return being audited or upon any other information within the department's possession. The department is authorized to examine and inspect the books, records, memoranda, and property of any person in order to verify the tax liability of that person or of another person. The department is authorized to subpoena any person to give testimony under oath before it and to require such person to produce whatever books, records or memoranda are necessary in order to enable the department to verify the tax liability of such person or of another person. The determination shall be presumed to be correct and the burden of proving it to be incorrect shall be upon the person challenging the correctness thereof. A determination by the department pursuant to a field audit becomes final at the expiration of the appeal periods hereinafter provided and the tax liability of the taxpayer for the period audited may not be subsequently adjusted, except as provided in sub. (8)."

■

During the tax period in issue no statutory provision in the sales tax law expressly exempted sales in Wisconsin of tangible personal property generally—or printed advertising material specifically—which were to be used solely outside the state. However, sec. 77.51(16), Stats.,[7] exempts from the use tax the retention of tangible personal property in Wisconsin for the purpose of subsequently transporting it outside the state for use solely outside the state. Moebius argues that the legislature intended the sales tax and use tax to be complementary; that in sec. 77.51(16), Stats., the legislature expressly exempted from the use tax the retention of tangible personal property in Wisconsin for subsequent transportation and later use solely outside Wisconsin; and that the intended complementariness of the sales and use tax statutes requires the court to interpret the sales tax statute to include an exemption which corresponds to the use tax exemption, namely, a sale tax exemption for the sale in Wisconsin of printed materials for use solely outside the state. We conclude that the overall complementariness of the use tax and sales tax does not justify this court's reading into the statutes a sales tax exemption which was not specifically set forth by the legislature.

■

It is generally conceded that the use tax was conceived as a necessary supplement to the sales tax and that the two taxes together should provide a symmetrical and complete tax system. The purpose of the use tax is to

---

[7] Sec. 77.51(16), Stats., provides:

"(16) 'Storage' and 'use' do not include the keeping, retaining or exercising any right or power over tangible personal property for the purpose of subsequently transporting it outside the state for use thereafter solely outside the state, or for the purpose of being processed, fabricated, or manufactured into, attached to or incorporated into other property to be transported outside the state and thereafter used solely outside the state."

prevent a buyer from avoiding a sales tax by purchasing goods outside the state. The use tax is designed to assure, as far as feasible, that there is a tax not only when the property is sold at retail in this state but also when it is purchased in another state for use here. Due, *State & Local Sales Taxation: Structure & Administration* 247–251 (1971); *U. S. Gypsum Co. v. Green,* 110 So.2d 409, 412 (Fla. 1959); *Avco Mfg. Corp. v. Connelly,* 145 Conn. 161, 140 A.2d 479 (1958); *State ex rel. Transport, Manufacturing and Equipment Co. v. Bates,* 359 Mo. 1002, 224 S.W.2d 996, 999 (1949).

Although the use and sales taxes are complementary and supplementary, the scope of the use tax is not merely a function of the scope of the sales tax. The two are separate taxes. *American Airlines, Inc. v. State Bd. of Equalization,* 216 C.A.2d 180, 190, 30 Cal. Rptr. 590 (1963). The taxes cover different events involving the same kinds of tangible personal property or services.

The sales tax is imposed on the retailer for the "privilege of selling, leasing or renting tangible personal property . . . at retail" and upon persons for the privilege of "selling, performing or furnishing . . . services . . . at retail . . . ." Sec. 77.52(1), (2), Stats. The use tax is imposed on a person for the storage, use or other consumption in this state of tangible personal property or taxable services described in sec. 77.52, Stats., the sale of which has not been reached by the sales tax. Secs. 77.53(1), (2), 77.53(16), 77.56(1), Stats. If tangible property or a service is not stored, used or otherwise consumed in this state within the statutory meaning of those words, then no event taxable under the use tax provisions has occurred, even if the sale of that property or service in Wisconsin would be taxable under sec. 77.52, Stats.

The terms "storage" and "use" are defined in sec. 77.51(14), (15) and (16), Stats.:

"(14) 'Storage' includes any keeping or retention in this state for any purpose except sales in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer.

"(15) 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership, possession or enjoyment of that property, including installation or affixation to real property and including the possession of, or the exercise of any right or power over tangible personal property by a lessee under a lease, except that it does not include the sale or rental of that property in the regular course of business.

"(16) 'Storage' and 'use' do not include the keeping, retaining or exercising any right or power over tangible personal property for the purpose of subsequently transporting it outside the state for use thereafter solely outside the state, or for the purpose of being processed, fabricated, or manufactured into, attached to or incorporated into other property to be transported outside the state and thereafter used solely outside the state."

As can be seen in the definitions of storage and use, the use tax is imposed on certain privileges of ownership, but not on all of them.

The statutes clearly provide that if property is purchased at retail in the state and is used outside Wisconsin it is subject to sales tax (unless specifically exempted, e.g., sec. 77.55, Stats.). The statutes just as clearly provide that if property is purchased outside Wisconsin and kept in Wisconsin for the purpose of subsequently transporting it outside the state for use thereafter solely outside the state, it is not subject to use tax in Wisconsin. Moebius would have us believe that the legislature did not intend this asymmetrical application of the sales and use tax. Moebius' reading of the statutes would exempt from the sales tax the sale of all tangible personal property—not only printed advertising material—

which is purchased and retained in Wisconsin for the purpose of subsequently transporting it outside the state by the purchaser for use thereafter solely outside the state. If the legislature intended this result it failed to state it.

Upon examination of the sales and use tax statutes we conclude that excluding from the use tax (but not from the sales tax) the keeping or retention of property in the state for subsequent use solely outside the state is a matter of public policy which was intentionally adopted by the Wisconsin legislature. Wisconsin is not the only state to have this use tax exemption. For a similar provision, *see, e.g.,* Deering's Calif. Codes Annot. sec. 6009.1. As we shall discuss later, there is a rational legislative policy for this use tax exemption.

Moebius argues that the imposition of a sales tax upon the sales of printed materials in Wisconsin, conjoined with the exclusion from the use tax of the mere retention in Wisconsin of materials for later use solely out of state, gives purchasers in Wisconsin who intend to transport the printed materials for use outside Wisconsin an incentive to purchase such materials outside the state. The tax provisions, Moebius contends, discriminate against Wisconsin retailers and constitute a denial of the equal protection of the law.

The standards that must be met by a taxpayer who challenges a tax classification on equal protection grounds were stated by this court in *Simanco, Inc. v. Department of Revenue,* 57 Wis.2d 47, 54, 55, 57, 203 N.W.2d 648 (1973):

"There is, however, a strong presumption that legislative enactments are constitutional, and the burden on one asserting the unconstitutionality of a properly enacted statute is heavy indeed. *Just v. Marinette County* (1972), 56 Wis.2d 7, 26, 201 N.W.2d 761; *State ex rel. Warren v. Reuter* (1969), 44 Wis.2d 201, 211, 170 N.W.2d 790.

"Moreover, where a tax measure is involved, the presumption of constitutionality is strongest. The courts have given recognition to the essentiality of taxation in preserving an ordered society, and there is implicit recognition in judicial decisions that the principle of absolute equality and complete congruity of the treatment of classifications is impossible and must be sacrificed in the interests of preserving the governmental function.

"This court has recognized that the equal-protection clause, unless apparent misclassifications are gross indeed, is of little moment in determining the constitutionality of a state tax. In *Hillside Transit Co. v. Larson* (1954), 265 Wis. 568, 583, 62 N.W.2d 722, the position of the court was well-summarized by Mr. Justice CURRIE, who stated:

" '. . . a legislature has much more leeway in granting exemptions in taxation measures than it does in regulatory measures under its police power without running athwart the equal-protection-of-the-laws clause of the Fourteenth amendment.'

" . . .

"Only if a challenger can show that the classification is arbitrary and has no reasonable purpose or relationship to the facts or a justifiable and proper state policy will a legislative classification fall on the grounds of a denial of equal protection. . . ."

The United States Supreme Court, using language similar to that used in *Simanco*, stated:

"The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination. *Harper v. Virginia Board of Elections,* 383 U.S. 663, 666. Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation. . . .

"We could strike down this tax as discriminatory only if we substituted our judgment on facts of which we can be only dimly aware for a legislative judgment that reflects a vivid reaction to pressing fiscal problems.

*Quaker City Cab Co. v. Pennsylvania* [277 U.S. 389] is only a relic of a bygone era. We cannot follow it and stay within the narrow confines of judicial review, which is an important part of our constitutional tradition." *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 365 (1973).

*See also Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 526, 527 (1959); *WKBH Television, Inc. v. Dept. of Revenue,* 75 Wis.2d 557, 560–566, 250 N.W.2d 290 (1977); *Ramrod, Inc. v. Dept. of Revenue,* 64 Wis.2d 499, 509, 510, 219 N.W.2d 604 (1974).

Neither the text nor the legislative history of the general sales and use tax act illuminates the legislative intent in subjecting to the sales tax the sale of products to be used outside the state, while exempting from the use tax the retention of those products for later use solely out of state.

Wahrhaltig, an Associate Tax Counsel, California State Board of Equalization, has explained the policy for the use tax exclusion as follows:

". . . As between the state wherein the property is merely stored and the state of actual use, there appears to be greater justification for the imposition of the tax by the latter.

". . .

". . . The reasons for such an exclusion are that the owner of the property would otherwise, at least so far as possible, ship directly to the state of use, a practice harmful to the state's warehouse operators and resulting in greater shipping costs to the owner, and that the purpose to be accomplished by the tax does not compel its application with respect to such property since local business does not in this instance require the protection afforded by a use tax and since, as a use tax is imposed merely as a complement to a sales tax, it should, like the sales tax, be imposed only once." Wahrhaltig, *Meaning of Retail Sale & Storage, Use or Other Consumption,* 8 *Law & Contemp. Prob.* 542, 558, n. 90 (1941).[8]

[8] *Cf. United Air Lines, Inc. v. Mahin,* 49 Ill.2d 45, 273 N.E.2d 585, (1971) vacated and remanded 410 U.S. 623 (1973), for a dis-

Moebius has failed to carry its burden of showing beyond a reasonable doubt that the legislature had no rational basis for enacting the challenged tax statutes. We hold that the interpretation given the statutes by the Department is correct and that the statutes do not violate the equal protection guarantee.[9]

### III.

Moebius maintains that the Department should collect the sales tax from the purchasers who supplied Moebius with exemption certificates, not from Moebius. Sec. 77.57, Stats., provides:

"**Liability of purchaser.** If a purchaser certifies in writing to a seller that the property purchased will be used in a manner or for a purpose entitling the seller to regard the gross receipts from the sale as exempted by this subchapter from the computation of the amount of the sales tax, and uses the property in some other manner or for some other purpose, the purchaser shall be liable for payment of tax. The tax shall be measured by the sales price of the property to the purchaser, but if the taxable use first occurs more than 6 months after the sale to the purchaser, he may use as the measure of the tax either such sales price or the fair market value of the property at the time the taxable use first occurs."

Moebius asserts that its purchasers certified in writing that the printed materials purchased would be used

cussion of a similar Illinois use tax exemption which the legislature stated was expressly intended to avoid actual or likely multistate taxation.

[9] The trial court in its discussion of the constitutional issue cites three cases from other states. *Union Portland Cement Co. v. State Tax Commission,* 110 Utah 152, 176 P.2d 879 (1947); *Edmunds v. Bureau of Revenue,* 64 N.M. 454, 330 P.2d 131 (1958); *Southwestern Bell Telegraph Co. v. Morris,* 345 S.W.2d 62 (Mo. 1961). Although each of these cases deals with "the problem of non-corresponding sales and use tax exemptions," none faced the issue raised by the case at bar.

solely outside Wisconsin and that the purchase was exempt from the sales tax. Moebius argues that if the sales at issue are not exempt from sales tax, the purchasers' assurances are false and the Department should look to the purchasers under sec. 77.57, Stats.

The exemption certificates here involved state that the claimed exemption is based on the purchaser's transporting the printed matter for use solely outside Wisconsin. In the case at bar the purchasers apparently used the printed material as certified, but the use stated by the purchasers does not make the transaction tax exempt. We have read sec. 77.57, Stats. and secs. 77.52 (13)–(16) and 77.53(10), (11), Stats., relating to exemption certificates. We cannot find any language which expressly or impliedly relieves a seller of liability for sales tax if the certificate on its face fails to state a legal basis for exempting the sale from sales tax.

### IV.

Moebius asserts that even if the sales at issue are taxable, the examination of Moebius' sales records by Tax Representative Lydon on October 8 and 9, 1970, constituted a "field audit" for the tax period from September 1, 1969 to September 30, 1970. The question whether Lydon's examination constituted a field audit becomes important because sec. 77.59(2), Stats., provides:

". . . A determination by the department pursuant to a field audit becomes final at the expiration of the appeal periods hereinafter provided and the tax liability of the taxpayer for the period audited may not be subsequently adjusted. . . ."

Moebius maintains that Lydon's letter to it dated October 9, 1970, constituted a "notice of determination" of tax liability for that period and that the "determina-

tion" by the Department pursuant to the "field audit" became final thirty days after Moebius received Lydon's letter.

The Tax Appeals Commission agreed in part with Moebius. The Commission concluded that the Department was precluded from subsequently adjusting the determination of October 9, 1970, on the basis of the 1972 field audit and from assessing a deficiency against Moebius for the month of August 1970. We agree with the conclusion of the Tax Appeals Commission.

The Department argues that Lydon merely conducted a "spot check," not a "field audit" of Moebius' records. Lydon testified before the Commission that the purpose of his "spot check" was to assure the Department "that the employer paid taxes, sales taxes, on total sales as reported for a period." An examination for this purpose is an audit, both in the ordinary use of the word and in its use in sec. 77.59, Stats. Professor Due, in *State and Local Taxation* (1971), p. 209, describes the sales tax audit as follows: "Successful sales tax administration requires investigation to ensure that vendors report the correct amount of tax due. Such investigation, involving analysis of the firms' returns and records, is known as audit." Webster's Third International Dictionary defines audit as "a methodical examination and review of a situation or condition (as within a business enterprise) concluding with a detailed review of findings." Sec. 77.59, Stats., authorizes the Department to determine a taxpayer's tax liability either by "office audit," "upon the basis of the facts contained in the return being audited or upon the basis of any other information within the department's possession," or by "field audit," in the course of which "the department is authorized to examine and inspect the books, records, memoranda, and property of any person," as

well as to subpoena any person to testify under oath, or to produce documents, regarding the tax liability of any taxpayer.[10] The general sales and use tax act nowhere authorizes the Department to conduct a "spot check," as distinct from an audit of one of these two types.

Lydon examined Moebius' records for August 1970 at Moebius' office for approximately nine hours and apparently filed a report with the Department. Even if denominated a "spot check" for internal department purposes, the audit was either an office audit or a field audit if it was authorized under the general sales and use tax act. That being so, there can be no doubt that it was a "field audit," under sec. 77.59, Stats., and not an "office audit."

Pursuant to sec. 77.59(2) and (6), Stats.,[11] Lydon's field audit for August 1970 became final thirty days

---

[10] Sec. 77.59(1), Stats., provides:

"(1) The department may, by office audit, determine the tax required to be paid to the state or the refund due to any person pursuant to this subchapter. The determination may be made upon the basis of the facts contained in the return being audited or upon the basis of any other information within the department's possession. The determination shall be presumed to be correct and the burden of proving it to be incorrect shall be upon the person challenging the correctness thereof. One or more such office audit determinations may be made of the amount due for any one or for more than one period."

Sec. 77.59(2), Stats., is quoted at note 6 *supra.*

[11] Sec. 77.59(6), Stats., provides:

"(6) Except as provided in sub. (4)(a), a determination by the department is final unless, within 30 days after receipt of the notice of such determination, the taxpayer, or other person directly interested, petitions the department for a redetermination. In the case of notice served by publication, the 30-day period commences with the last day of such publication of notice.

"(a) Within 6 months of the receipt by the department of the petition for redetermination, the department shall notify the petitioner of its redetermination. Such redetermination shall become

after Moebius received a notice of determination of tax liability from the Department based on that audit. Moebius claims Lydon's letter of October 9 is a notice of determination.

Sec. 77.59(3), Stats., provides that a notice of determination of tax liability must be in writing, must be timely given, must specify whether the determination is based on a field audit or an office audit, and must be served personally or by registered or certified mail.[12] Lydon's letter states that it was based on a "spot check . . . of all accounts payable and all sales . . . ." Neither the words "field" nor "office audit" appear in the letter as required by sec. 77.59(3), Stats. The letter was

final 30 days after receipt by the petitioner of notice thereof unless, within that 30-day period, the petitioner appeals the redetermination under par. (b).

"(b) Appeals from the department's redeterminations shall be governed by the statutes applicable to income tax appeals but all appeals from decisions of the tax appeals commission with respect to the taxes imposed by this subchapter shall be appealed to the circuit court for Dane county."

[12] Sec. 77.59(3), Stats., provides:

"(3) No determination of the tax liability of a person may be made unless written notice of such determination is given to the taxpayer within 4 years of the due date of the annual information return or within 4 years of the date the annual information return was filed with the department, whichever is later. The notice required herein shall specify whether the determination is an office audit determination and it shall be served personally or by registered or certified mail. If the department is unable to obtain personal service or service by registered or certified mail, publication thereof as a class 3 notice, under ch. 985, shall constitute service of notice in any case where notice is required under this subchapter.

"(a) If the taxpayer has consented in writing to the giving of notice after such time, the notice may be given at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing."

mailed by ordinary first-class mail and therefore did not comply with the requirement of personal service or service by registered or certified mail. These statutory requirements are designed to protect the taxpayer by ensuring that the taxpayer receives adequate and full notice of the nature of the determination. Under the circumstances of this case, we regard the letter as being in substantial compliance with the requirements of sec. 77.59. We are unwilling to deprive Moebius of the benefits of sec. 77.59, Stats., because of these defects in the letter.

Accordingly, we affirm the conclusion of the Tax Appeals Commission that Lydon's examination of Moebius' records for August 1970 was a field audit and that the result of that audit became final thirty days after Moebius received Lydon's letter which we construe as a notice of determination based upon that field audit.

Moebius asserts that it made available to Lydon sales records covering the period September 1, 1969 through September 30, 1970, and that the Commission's conclusion that only the month of August 1970 is not open to reassessment is error. The Commission found that Lydon examined Moebius' books and records for the month of August, 1970 and that the audit was only for the month of August 1970. This finding is supported by Lydon's undisputed testimony, as well as by the language of the letter itself. We conclude that Lydon's letter and audit do not constitute a bar to an assessment for the period from September 1, 1969 to September 30, 1970 (except for August 1970).

## V.

Moebius asserts that the Department is estopped from collecting that portion of the contested sales tax based on sales made after Tax Representative Lydon examined

the sales records at Moebius' office in October, 1970, and wrote Moebius that the exemption certificates it had on file were valid. As authority for the proposition that the Department may be estopped by conduct such as Lydon's, Moebius cites *Libby, McNeil & Libby v. Department of Taxation,* 260 Wis. 551, 51 N.W.2d 796 (1952).

In *Libby* this court found the Department was estopped to collect a tax deficiency on the following facts. Libby, McNeil & Libby, relying upon the 1941 holding of this court in *J. C. Penney Co. v. Tax Commission,* 238 Wis. 69, 298 N.W. 186 (1941), and the Department's acquiescence in that holding, had not withheld and paid to the state any dividend taxes upon dividends paid stockholders in 1944, 1945 and 1946. In 1947, this court overruled *J. C. Penney.* See *Dept. of Taxation v. Nash-Kelvinator Corp.,* 250 Wis. 533, 27 N.W.2d 889 (1947). The Department then assessed a dividend tax deficiency against Libby, McNeil & Libby for the years 1944-1946, arguing that the 1947 *Nash-Kelvinator* case was applicable to the Libby Company and that dividends paid during 1944-1946 were taxable.

In the *Libby* case, the court agreeing with the Department that the 1947 *Nash-Kelvinator* case controlled, then discussed the doctrine of estoppel:

"The more serious question is: Is the state under the circumstances estopped to assert its claim? Having acquiesced, in accordance with the decision in the *Penney Co. Case* in petitioner's omission to deduct and pay the tax during the years involved, may it now, since that case was overruled in 1947 by the decision in the *Nash-Kelvinator Case,* compel the corporation to pay out of its own funds the tax which it would otherwise have deducted from dividends paid to its stockholders?

". . .

"True, the doctrine of estoppel is not applied as freely against governmental agencies as it is in the case of private persons. But we conclude that the undisputed

facts in this case call for the application of the doctrine because the previous conduct of the department, motivated if not compelled by the pronouncement of the state's highest court, caused petitioner in good faith to change its position in such a way that an inequitable result would ensue to it if the estoppel were denied." 260 Wis. at 555, 559.

The Department urges this court to distinguish the instant case from the *Libby* case because Moebius asserts reliance upon a letter from a Tax Representative, rather than reliance upon Departmental acquiescence in the holding by the Wisconsin Supreme Court.

This court has recognized that a governmental agency may be estopped even when it acts in its governmental capacity. *Libby, McNeil & Libby v. Dept. of Taxation, supra,* 260 Wis. at 557.

In *Kohlenberg v. American Plumbing Supply Co.,* 82 Wis.2d 384, 396, 263 N.W.2d 496 (1978), we stated that the following factors must be present for this court to find estoppel in a case involving a non-governmental agency:

". . . The defense of equitable estoppel consists of action or non-action which, on the part of one against whom estoppel is asserted, induces reliance thereon by the other, either in action or non-action, which is to his detriment. *Chicago & Northwestern Transportation Co. v. Thoreson Food Products, Inc.,* 71 Wis.2d 143, 153, 238 N.W.2d 69 (1976). It is elementary, however, that the reliance on the words or conduct of the other must be reasonable *(Chicago & Northwestern Transportation Co. v. Thoreson Food Products, Inc., supra* at 154) and justifiable *(Matter of Alexander's Estate,* 75 Wis.2d 168, 183–84, 248 N.W.2d 475 (1977) )."

Although Moebius raised the defense of estoppel before the Commission, neither the Commission's findings

of fact nor conclusions of law relate to this issue. The trial court's decision does not discuss this issue. However under the facts of this case the majority of this court concludes that the elements of the defense of estoppel are satisfied and a remand for fact-finding is not necessary.

The action of the Department upon which Moebius relied was Lydon's examination of the sales records for August 1970 in the Moebius office and the letter from Lydon to Moebius on October 9, 1970, informing Moebius that Lydon reported to the Department that the exemption certificates Moebius had on file for August 1970 were valid. The entire letter is printed in the margin.[13]

---

[13] EXHIBIT B, LETTER DATED OCTOBER 9, 1970, James William Lydon to Moebius Printing

Moebius Printing October 9, 1970
300 N. Jefferson St.
Milwaukee, Wisconsin 53202

Mr. Clemens Czynszak: My report covering Moebius included the following, "Contacted Clem Czynszak and his associate Rudy Peters. Both are well versed on the sales tax law, they referred to the Statutes several times in our discussion, they subscribe to our TIM service, and they also receive consultation from their association Printing Industries of Wisconsin.

A spot check was made of all accounts payable and all sales for the month of August 1970, list attached. For every purchase Moebius made during the period there had been either tax paid or valid exemption certificates on file. Sales for the same period was checked and again proper certificates were on file.

This tax representative received several valid complaints from taxpayers; Moebius has several letters on file from Misters Blume, Erickson, Branton and Morgan which either does not answer taxpayers questions or contradicts previous information; the last meeting held in Milwaukee by the Department conducted by Foy, Rau, Sosinski, and Trester ended in an argument among themselves, and not to anyone's benefit.

I suggest sending a person to their plant who has the authority to advise this taxpayer and set definite policy.

Clemens V. Czynszak and Rudolph Peters, corporate controller and assistant to the controller at Moebius, testified before the Commission that after receiving Lydon's letter they believed that the exemption certificates were in compliance with the law and did not collect sales tax from the purchasers. Prior to Lydon's examination and letter, however, they had been uncertain whether exemption certificates based upon the purchaser's intention to use the purchased goods solely outside Wisconsin were valid. They testified that they had been confused regarding exemption certificates as a result of changes in the tax statutes and Department policy and also as a result of attendance at meetings at which Department representatives were unable to agree regarding the validity of various certificates. The majority concludes that Moebius' continued acceptance of the contested exemption certificates after Lydon's audit and letter was in reliance upon Lydon's representations, rather than a course of conduct that would have continued even if those representations had not been made.

The majority concludes that this reliance by Moebius on Lydon's representations was reasonable and justifiable. Lydon appeared to have the authority to make those representations. When he arrived at the Moebius office to examine the sales records, Lydon presented a business card identifying him as with the "State of Wisconsin, Department of Revenue, Income Sales and Excise Tax Division, 819 North Sixth St., Milwaukee, Wis. 53203, (414) 224-4444." The card Lydon presented was identical, except for Lydon's name, to the card pre-

---

In my opinion Moebius is doing an excellent all around job in compliance with the Wisconsin sales tax law.

/s/ James Lydon
James Lydon
Tax Representative

sented by the Department representative who performed the field audit on which the deficiency assessment was based. Unlike other Department representatives whom Moebius officials had heard discuss exemption certificates, Lydon had actually examined Moebius' books and records. Lydon wrote Moebius that he had reported to the Department that Moebius' "sales . . . [were] checked and . . . proper [exemption] certificates were on file." The Department did not communicate with Moebius again for over a year. Under these circumstances the majority holds that it was reasonable for Moebius to believe that it was permitted to omit to collect and report sales taxes on the gross receipts from sales to purchasers providing certificates.

By not collecting sales tax from customers who filed certificates based on intended out-of-state use, Moebius changed its position in such a way that it will be harmed if the Department is not estopped from collecting the deficiency. Although originally Moebius could have collected the sales tax as a matter of course from its customers, if it is now required to pay the deficiency, Moebius' ability to collect the tax retroactively from those purchasers during 1970 and 1971 who filed exemption certificates is unclear. In this respect the case at bar is essentially the same as *Libby,* in which Libby, McNeil & Libby did not withhold the dividend tax from dividends it sent shareholder.

The author dissents from the majority opinion insofar as it concludes, from the record before it, that Moebius relied upon Lydon's letter and that the reliance of Moebius upon Lydon's letter was reasonable. She does not believe that the court can reach this conclusion as a matter of law. Lydon's letter to Moebius was very informal. It was typed on plain white paper, with no Department letterhead. It was typed by Lydon himself.

It merely indicated that Lydon's report to the Department had "included" certain statements. It did not indicate what else the report included or what action by the Department Moebius might expect. Testimony by officers of Moebius before the Commission indicated that prior to the audit they had made substantial attempts, both on their own and through their industry association, to learn about the effect of the sales tax law on their business. Yet Moebius officials made no inquiry of the Department to determine what effect, if any, the unusual letter from Lydon might have.

Because the majority concludes that the elements of the defense of estoppel against a private person are met in the case at bar, we must next consider whether the defense of estoppel shall be applied against a state agency. We have frequently said that "the doctrine of estoppel is not applied as freely against governmental agencies as it is in the case of private persons." *Libby, McNeil & Libby v. Dept. of Taxation, supra,* 260 Wis. at 559.

Courts have recognized "the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint, for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals." *Schuster v. CIR,* 312 F.2d 311, 317 (9th Cir. 1962). Nevertheless we have recognized that estoppel may be available as a defense against the government if the government's conduct would work a serious injustice and if the public's interest would not be unduly harmed by the imposition of estoppel. *Park Bldg. Corp. v. Industrial Comm.,* 9 Wis.2d 78, 87, 100 N.W.2d 571 (1960). *See also United States v. Lazy FC*

*Ranch,* 481 F.2d 985, 989 (9th Cir. 1973) ; Comment, *Emergence of an Equitable Doctrine of Estoppel Against the Government—The Oil Shale Case,* 46 U. Colo. L. Rev. 433 (1974–75) ; Annot., *Modern Status of Applicability of Doctrine of Estoppel Against Federal Government and Its Agencies,* 27 A.L.R. Fed. 702 (1976). In each case the court must balance the injustice that might be caused if the estoppel doctrine is not applied against the public interests at stake if the doctrine is applied.[14]

We have not allowed estoppel to be invoked against the government when the application of the doctrine interferes with the police power for the protection of the public health, safety or general welfare. *State v. Chippewa Cable Co.,* 21 Wis.2d 598, 608, 609, 124 N.W.2d 616 (1963) ; *Park Bldg. Corp. v. Ind. Comm.,* 9 Wis.2d 78, 87, 88, 100 N.W.2d 571 (1960) ; *Town of Richmond v. Murdock,* 70 Wis.2d 642, 653, 654, 235 N.W.2d 497 (1975) ; *McKenna v. State Highway Comm.,* 28 Wis.2d 179, 186, 135 N.W.2d 827 (1965) ; *Milwaukee v. Milwaukee Amusement, Inc.,* 22 Wis.2d 240, 252–53, 125 N.W.2d 625 (1964).

Because the state's exercise of the police power for the public good is not possible without the support of revenues gathered by taxation from the public, courts have often been as reluctant to estop the state in matters of taxation as in matters within the police power. We have said that "the taxes represent a just debt to the state, and the people of the state have an interest in seeing that each taxpayer bears his fair share of the tax burden." *Miller v. Department of Taxation,* 241 Wis. 145, 147, 5 N.W.2d 749 (1942). However other

[14] For a discussion of the development of the law relating to estopping the government, see 2 Davis, *Administrative Law Treatise,* ch. 17 (1958) and 1970 Supplement; Davis, *Administrative Law of the Seventies,* ch. 17 (1976).

considerations suggest that estoppel may be available in the proper case against the state in matters of taxation. *Schober v. Milwaukee,* 18 Wis.2d 591, 599, 119 N.W.2d 316 (1963) (Currie, J. concurring opinion).

Revenues to support state services are gathered primarily as a result of the conscientious and voluntary compliance of taxpayer with the tax laws and Department procedures. It is important that taxpayers receive fair play from tax officials. *Interstate Fire Ins. Co. v. United States,* 215 F. Supp 586, 600 (E.D. Tenn. 1963); Lynn and Gerson, *Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies,* 19 Tax. L. Rev. 487, 498 (1964); Berger, *Estoppel Against the Government,* 21 U. Chi. L. Rev. 680, 688 (1954).[15]

Moreover holding the Department estopped to collect a tax deficiency from a particular taxpayer will ordi- narily cause less direct harm to the public good than will a similar holding in the sphere of the State's exercise of the police power. To estop the state's action in the sphere of the police power is typically to expose a significant number of persons to a risk the legislature has determined to be contrary to their safety, welfare, health or morals. To estop the state from collecting taxes from a taxpayer reduces the revenue available to the state but does not expose a significant number of persons directly to some specific harm the legislature has sought to prevent. Moreover if any added burden is placed upon taxpayers as a result of estopping the state from collecting a particular tax, the burden would probably be minute.

---

[15] Comment, *Never Trust A Bureaucrat: Estoppel Against the Government,* 42 S. Cal. L. Rev. 391 (1969); Newman, *Should Official Advice Be Reliable?—Proposals As To Estoppel & Related Doctrines in Administrative Law,* 53 Colum. L. Rev. 374 (1953); *Tonkonogy v. United States,* 417 F. Supp. 78 (S.D.N.Y. 1976).

We conclude that where a party seeks to estop the Department of Revenue and the elements of estoppel are clearly present, the estoppel doctrine is applicable where it would be unconscionable to allow the state to revise an earlier position. *Libby, McNeil & Libby v. Dept. of Taxation, supra,* 260 Wis. at 558, 559. In each case the court must determine whether justice requires the application of the doctrine of estoppel; the determination of whether the state is estopped must be made on a case-by-case basis.

In the case at bar, we find it significant that shortly after the tax period at issue, the legislature enacted an exemption from the sales tax covering precisely the type of sale the state here attempts to tax. Sec. 77.54(25), Stats. Ch. 311, Laws of 1971. This section of the statutes expresses the legislature's determination that it is not contrary to the public interest for such transactions to be exempt from sales tax, or for the revenue of the state to be diminished by the amount that taxation of such sales would have brought into the state treasury. The legislature did not apply this provision retroactively, nor does this court. But we do rely upon it for legislative guidance regarding the public interest at a point in time close to the tax period here involved. Because of the legislative policy and the significant loss Moebius would suffer if the Department were permitted to collect taxes after Moebius had reasonably relied upon Lydon's letter, we conclude that the Department is estopped from collecting the sales tax due upon sales of printed materials by Moebius to purchasers who stored the printed materials in Wisconsin for later transportation and use solely out of state. This estoppel affects only those sales by Moebius after October 9, 1970, the date of Lydon's letter containing the representations upon which Moebius relied. The Department is not estopped

from collecting the taxes upon sales prior to October 9, 1970, although it is prevented by the operation of sec. 77.59, Stats., from collecting any tax deficiency for gross receipts from sales during August, 1970.

The record does not permit us to determine what portion of Moebius' entire tax deficiency for the tax period from September 1, 1969 to December 31, 1971, arose from sales after October 9, 1970. Accordingly we remand the cause for a determination of that amount of taxes.

*By the Court.*—Case No. 76–766. Judgment affirmed. Case No. 76–767. Judgment modified and, as modified, affirmed; cause remanded for further proceedings not inconsistent with this opinion.