Ray M. THOMPSON, Petitioner-Respondent,

v.

WISCONSIN DEPARTMENT OF PUBLIC INSTRUCTION,
Respondent-Appellant.

Court of Appeals

*No. 94–3293. Oral argument September 14, 1995.—Decided
October 17, 1995.*

(Also reported in 541 N.W.2d 182.)

690

On behalf of the respondent-appellant the cause was submitted on the briefs of *James E. Doyle*, attorney general and *Warren D. Weinstein*, assistant attorney general. There was oral argument by *Warren D. Weinstein*.

On behalf of the petitioner-respondent the cause was submitted on the briefs of *Stephen Pieroni* and *Chris Galinat* of Wisconsin Education Association

Council of Madison. There was oral argument by *Stephen Pieroni*.

Amicus Curiae brief was filed by *Douglas F. Bates* for National Association of State Directors of Teacher Education and Certification.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J.   The Wisconsin Department of Public Instruction ("department") appeals a trial court judgment that reversed the decision of the State Superintendent of Public Instruction ("superintendent") to revoke Ray M. Thompson's teaching license. The department contends that the trial court erred because: (1) it refused to use a deferential standard of review to the superintendent's conclusions of law and statutory interpretations; (2) it determined that the superintendent applied the wrong standard to determine whether a nexus existed between Thompson's immoral conduct and the health, welfare, safety or education of any pupil; and (3) it determined that the department did not prove by clear and convincing evidence that Thompson's immoral conduct had a nexus to the health, welfare, safety or education of any pupil.

While we agree with the department that the superintendent's determination is entitled to deference, we conclude that the superintendent applied the wrong standard in determining whether a nexus existed between Thompson's immoral conduct and the health, welfare, safety or education of any pupil. Further, we do not reach the sufficiency of the evidence issue because we conclude that the superintendent should be allowed to review the facts and apply the proper legal standard. Accordingly, we affirm the trial court's judgment in part, reverse it in part and remand

the matter to the superintendent for the application of the proper standard.

Thompson has a life teaching license in music for pre-kindergarten through twelfth grade. Thompson was a full-time music teacher for over twenty years in Wisconsin, working primarily for the Oshkosh School District elementary and secondary schools.

However, Thompson was involved in two incidents of unwanted sexual touching that led to license revocation proceedings. The first occurred when Thompson went to Rainbow Park in Oshkosh, a known meeting place for homosexual men. Thompson played "automobile tag" with a man he believed to be homosexual. The man parked his vehicle and walked over to a park bench. Thompson followed and sat down beside him. Thompson then reached over, grabbed the other man around the breast area, fondled his breast and reached down the inner part of his left thigh. When a police car approached, the man ran to the police car and told the officer that he had been assaulted by Thompson. Thompson pled no contest to a disorderly conduct violation.

Approximately two years later, Thompson went to a video bookstore that displayed pornographic movies and materials and served as a meeting place for homosexual men. Thompson entered an unlocked booth occupied by an undercover police officer and immediately began unbuttoning the officer's shirt. The officer protested that he did not want to do anything in the booth, but Thompson persisted and grabbed the officer's genitals. A jury convicted Thompson of fourth-degree sexual assault. In the subsequent license revocation proceeding, the finder of fact found that Thompson's behavior did not reflect a predatory nature and that the assault was not aggravated.

The Oshkosh Board of Education discharged Thompson and the department subsequently issued a Notice of Probable Cause and Intent to Revoke License. Following a five-day hearing and the submission of briefs, hearing examiner Hal Harlowe issued a proposed decision recommending that the revocation action be dismissed. He concluded that there was not clear and convincing evidence that a nexus existed between Thompson's actions and the health, welfare, safety or education of any pupil. *See* WIS. ADM. CODE § PI 3.04. However, the superintendent declined to adopt the examiner's recommendation and issued a decision to revoke Thompson's license.

Thompson filed a petition for judicial review, and the trial court held that the superintendent had not complied with § 227.46(4), STATS., because he failed to hear the case or review the record prior to issuing his decision. The court stayed the revocation order and remanded the case to the superintendent.

On remand, the superintendent assigned Dr. Thomas Stefonek, a department employee, to read the record and issue a proposed decision. Stefonek agreed with Harlowe that there was not clear and convincing evidence that Thompson's conduct had a nexus to the physical health, welfare or safety of any pupil. However, Stefonek accorded different weight to the expert testimony presented at the hearing and found that the department did prove by clear and convincing evidence that Thompson's immoral conduct had a nexus to the education of pupils and their welfare as it related to the educational process. The basis for Stefonek's conclusion was that Thompson could no longer be an effective role model for the students because the pupils, their parents and the public would lack confidence, respect and regard for Thompson. Accordingly, Stefonek rec-

ommended that Thompson's license be revoked. The superintendent adopted Stefonek's recommendation.

On review of this decision, the trial court reversed. The court reviewed the superintendent's conclusions of law de novo. The court held that the superintendent used an improper standard in revoking Thompson's license because he based the decision upon an impossibly high role model standard under which any teacher deemed to be a poor role model could have his or her license revoked. The court further held that the superintendent's decision was not supported by substantial evidence.

The superintendent's decision to revoke Thompson's teaching license was based on the revocation provisions in § 118.19, STATS., 1989-90[1], and WIS. ADM. CODE § PI 3.04 (February 1989). The relevant portions of § PI 3.04 provide:

> (1) DEFINITIONS.
>
> . . . .
>
> (a) "Immoral conduct" means conduct or behavior which is contrary to commonly accepted moral or ethical standards.
>
> . . . .
>
> (2) STANDARDS FOR REVOCATION.
>
> . . . .

---

[1] Section 118.19, STATS., 1989-90, provides in part:

(1) Any person seeking to teach in a public school or in a school or institution operated by a county or the state shall first procure a certificate or license from the department.

. . . .

(5) After written notice of the charges and of an opportunity for defense, any certificate or license to teach issued by the department may be revoked by the state superintendent for incompetency or immoral conduct on the part of the teacher.

(a)   A license may be revoked for immoral conduct if there is clear and convincing evidence that the person engaged in the immoral conduct and there is a nexus between the immoral conduct and the health, welfare, safety or education of any pupil.

On appeal, we review the decision of the superintendent, not the trial court. *See St. Paul Ramsey Medical Ctr. v. DHSS*, 186 Wis. 2d 37, 43, 519 N.W.2d 681, 683 (Ct. App. 1994). Our scope of review is identical to that of the trial court. *Id.*

The proper standard of review regarding the superintendent's determination of whether Thompson's immoral conduct had a nexus to the health, welfare, safety or education of any pupil is disputed. This issue involves a review of the superintendent's interpretation of § 118.19, STATS., and § PI 3.04 and application of facts to these laws, which is a question of law. *Carrion Corp. v. DOR*, 179 Wis. 2d 254, 264, 507 N.W.2d 356, 359 (Ct. App. 1993).

■
Generally, appellate courts apply "three levels of deference to conclusions of law and statutory interpretation in agency decisions." *Jicha v. DILHR*, 169 Wis. 2d 284, 290, 485 N.W.2d 256, 258 (1992). The first level of review, "great weight," is applied where the "agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute . . . ." *Id.* at 291, 485 N.W.2d at 258-59. The second level, "due weight" or "great bearing," is applied if the decision is very nearly one of first impression. *Id.* at 291, 485 N.W.2d at 259. The lowest level of review, "de novo," "is applied where the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented." *Id.*

Thompson contends that the trial court did not err when it applied the de novo standard to the superintendent's conclusions of law and statutory interpretations because this case involves legal issues of first impression and the superintendent lacks experience using a role model standard in determining whether a nexus exists between the immoral conduct and the health, welfare, safety or education of any pupil.

However, the record shows that the superintendent has ordered revocation of teacher licenses based upon immoral conduct and determined whether a nexus exists between a teacher's immoral conduct and the health, welfare, safety or education of any pupil in nearly 100 cases. Through this experience, the superintendent has developed special skill, experience and understanding of the educational process and the appropriate atmosphere necessary to support effective education. We therefore conclude that the trial court erred by applying a de novo standard of review to the superintendent's conclusions of law and statutory interpretation.

We further conclude that the appropriate standard of review in this case is due weight and not great weight. While the superintendent does have expertise in dealing with nexus issues, this is the first time he has used a role model standard to determine whether a nexus exists. Because this is the first time the role model standard has been used, it has not been tested by time, it has never been judicially reviewed and the superintendent has no experience in its application. Accordingly, we conclude that while the superintendent has experience with the general area in controversy, the superintendent's rationale is one of

first impression. Therefore, we apply the due weight standard of review. *See West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 12 n.12, 357 N.W.2d 534, 540 n.12 (1984).

The department agrees that under § PI 3.04 it has the burden to prove by clear and convincing evidence that a nexus exists between Thompson's immoral conduct and the health, welfare, safety or education of any pupil. In this case, Stefonek first determined that Thompson's immoral conduct did not have a nexus to the physical safety of any pupil. However, he concluded that Thompson's immoral conduct had a nexus to the education of pupils because Thompson could no longer be a good role model for students. Stefonek reasoned that the educational experience could not be effective when the pupils, their parents and the public lack confidence, respect and regard for the teacher.

While the superintendent's conclusions of law are subject to various interpretations, the department acknowledged at oral argument that he relied on a standard that has been identified as the "role model standard." Under this standard, a teacher must be a good role model and have the confidence, respect and regard of the pupils, their parents and the community. We conclude that this is an unreasonable interpretation of § PI 3.04 because it would make the requirement of nexus superfluous and permits revocation based solely on public attitudes.

Applying a role model standard reflecting community attitudes effectively eliminates the nexus requirement. All cases of immoral conduct are by definition offensive to community standards. Because a role model rationale assumes all conduct offensive to the community standard hinders the educational pro-

cess, nexus is subsumed in all cases involving immoral conduct. However, the plain meaning of § PI 3.04 provides that not all immoral conduct should result in license revocation. The nexus requirement is there for a reason: to make sure there is a direct link between the immoral conduct and the health, welfare, safety or education of any pupil.

Further, a standard based on community attitudes cannot be applied consistently. Community attitudes are difficult to measure, they vary from community to community, and they change over the course of time. This standard is so amorphous as to give no criterion upon which the agency can meaningfully and consistently apply this rationale to license revocation proceedings.

We therefore conclude that the standard used by the superintendent in this case was inappropriate. It is not the superintendent's role to speculate how the general public may perceive specific conduct or determine who is a good role model. Rather, the superintendent, under the terms of § PI 3.04 is obligated to determine whether there is a direct relationship between the immoral conduct and the health, welfare, safety or education of any pupil. If the conduct is of such severity as to adversely affect the atmosphere in which education must exist to be effective, or to endanger the health, welfare or safety of any of the children, revocation is appropriate.

We have no doubt that conduct sufficient to sustain a conviction for fourth-degree sexual assault can be a sufficient basis to warrant revocation of a teacher's license. The superintendent can examine the convictions and their severity to determine whether these offenses would interfere with the educational process.

The impact, if any, upon a child's ability to learn based upon the seriousness and nature of these offenses are matters committed to the superintendent under the provision of § PI 3.04. Because these offenses are criminal in nature and involved nonconsensual sexual touching, the superintendent may conclude that the educational process is irretrievably compromised. However, in making this determination, the superintendent must examine the offense and not the community reaction to it.

Thompson suggests that his immoral conduct could not adversely affect the educational process because the public did not know of the conduct in the communities where he was substitute teaching. We disagree. The superintendent need not wait for the public to discover the conduct before initiating revocation proceedings. In an age of rapid mass communications, it is unrealistic to believe the public would forever remain ignorant of his conduct. More importantly, it is immaterial that the public does not know of the conduct because the superintendent is required to examine the conduct and not the public reaction to it.

Next, Thompson contends that the evidence of his alcohol rehabilitation and his recent substitute teaching must be considered by the superintendent in making the determination of nexus. The record discloses that alcohol played a role in Thompson's immoral conduct, and Thompson introduced evidence that he has sought counseling with Alcoholics Anonymous and is no longer drinking. In addition, Thompson has served as a substitute teacher in various Fox River Valley School Districts and has had satisfactory evaluations.

The department contends that this evidence is only relevant to possible reinstatement proceedings because the revocation proceeding only requires a nexus between the immoral conduct and the health, welfare, safety or education of any pupil; it does not require consideration of new factors. In reinstatement proceedings, Thompson would have to establish that the cause for revocation no longer exists and that he no longer endangers the health, welfare, safety or education of pupils. WIS. ADM. CODE § PI 3.04(5)(b). Although it is permissible for the superintendent to consider the evidence in revocation proceedings, we conclude the superintendent is required to consider the evidence only upon an application for reinstatement.

We affirm the trial court's determination that the superintendent applied the wrong standard to decide whether a nexus exists between Thompson's immoral conduct and the health, welfare, safety or education of any pupil. However, we conclude the superintendent is entitled to an opportunity to review the facts of this case and to apply the proper legal standard to Thompson's immoral conduct. *See* § 227.57(5), STATS. Therefore, we affirm the judgment in part, reverse in part and remand the matter to the superintendent to determine, under the proper standard, whether Thompson's immoral conduct has a direct link to the educational process.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.

CANE, P.J. (*dissenting*). I conclude that it was appropriate for the State Superintendent of Public

Instruction to consider Thompson's ability to serve as a role model as a factor when determining whether there was a nexus between his immoral conduct and the health, welfare, safety or education of pupils. Therefore, I respectfully dissent.

Thompson does not dispute the superintendent's finding that he engaged in immoral conduct. It is uncontroverted that Thompson sexually assaulted two men and has been twice convicted for that immoral conduct. The first act resulted in a disorderly conduct conviction, and the second act resulted in a sexual assault conviction. It is also uncontroverted that he was discharged from his teaching position in Oshkosh because of this immoral conduct.

The superintendent found there was a nexus between Thompson's immoral conduct and the health, welfare or education of any pupil. He did not find a nexus for the safety of pupils. He therefore revoked Thompson's license to teach. Unlike the majority, I would hold that whether there is a nexus between the immoral conduct and the health, welfare or education of pupils is a question of fact. Appellate review of the superintendent's findings is governed by § 227.57(6), STATS., which provides that we are not to substitute our judgment for that of the agency as to the weight of the evidence in any disputed finding of fact. Additionally, we are not to set aside any agency action if the agency's findings are supported by substantial evidence. The substantial evidence test requires this court to affirm the agency if, after examining the entire record, the evidence, including reasonable inferences therefrom, is such that a reasonable person might have reached the same decision. *Kenosha Teachers Union v. WERC,* 39 Wis. 2d 196, 204, 158 N.W.2d 914, 918 (1968). The

issue on appeal becomes whether there is substantial evidence to support the superintendent's finding.

Thompson's ability to serve as a role model was one of numerous factors the superintendent considered when he determined there was a nexus between his immoral conduct and the health, welfare or education of any pupil. In his conclusions, the superintendent stated, "The testimony of the teaching professionals offered by the Department is probative of the underlying character traits, role model, leadership, and other qualities properly considered for determining the nexus between the immoral conduct of Mr. Thompson and detriment to the health, safety, welfare, or education of any pupil."

The majority rejects considering the factor whether a teacher may serve as a role model, but this factor has been accepted in other jurisdictions and is not something new or startling. In *Pettit v. State Bd. of Educ.,* 513 P.2d 889 (Cal. 1973), the California Supreme Court affirmed the revocation of a teacher's license and applied a reasoning similar to the superintendent's rationale in Thompson's case. In California, a teacher's license may be revoked if the evidence discloses that the teacher's retention within the school system poses a significant danger of harm to either students, school employees or others who might be affected by their actions. In *Pettit,* the California Supreme Court reasoned that a showing of significant harm could be based on adverse inferences drawn from the teacher's past conduct and the likelihood that the publicity surrounding the past conduct may, in and of itself, substantially impair that person's function as a teacher. *Id.* at 892. The court went on to hold:

"A teacher . . . in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the children coming under her care and protection." . . . [T]he board and the trial court were entitled to conclude on the basis of the expert testimony . . . and the very nature of the misconduct involved, that Mrs. Pettit's illicit and indiscreet actions disclosed her unfitness to teach in public elementary schools.

*Id.* at 894 (quoting *Board of Educ. v. Swan,* 261 P.2d 261, 265 (Cal. 1953), *overruled on other grounds by Bekiaris v. Board of Educ.,* 493 P.2d 480 (Cal. 1972)).

The United States Supreme Court has also recognized that teachers serve as role models in the school system and, as such, the state has a legitimate interest in ensuring that teachers can perform as a role model. It stated:

Within the public school system, teachers play a critical part in developing students' attitude toward government and understanding of the role of citizens in our society. Alone among employees of the system, teachers are in direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school. In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way the course material is communicated to students. They are responsible for presenting and explaining the subject matter in a way that is both comprehensible and inspiring. No amount of standardization of teaching materials or lesson plans can eliminate the personal qualities a teacher brings to bear in achieving these goals. Further, a teacher serves as a role model for his students, exerting a subtle but important influence over their percep-

tions and values. Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities. This influence is crucial to the continued good health of a democracy.

*Ambach v. Norwick,* 441 U.S. 68, 78-79 (1979) (footnote omitted).

All teachers have an obligation to promote civic virtues and responsibility in their classes, regardless of the subject taught. The superintendent must be able to take into account the teacher's function as an example for students. In fact, in § 118.01(2), STATS., our legislature has mandated that all public schools provide instructional programs designed to give our pupils a commitment to the basic values of our government including the United States and Wisconsin Constitutions and the ability to construct personal ethics and goals. It is the obligation of teachers to impart these basic values through instruction and by example.

The superintendent in this case properly recognized that teachers do more than teach subject material in the classroom; they also influence students by their conduct. It recognized that teachers' actions outside the classroom can also affect their fitness to teach. The superintendent stated:

For approximately seven hours a day, five days a week, nearly half of a child's waking existence, the children of our state are captive audiences for teachers certified by the department. During the impressionable school-age years, teachers are not merely instructors of curricular content. They are authority figures, role models, behavioral examples and surrogate parents. Children learn more from

their teacher than music, mathematics, and reading. They learn important values and morals.

When the immoral conduct is so severe that it affects the students' health, safety, welfare or education, then it is a basis for revocation of the teacher's license. In this case, the superintendent did not survey public attitudes to determine the effect of Thompson's immoral acts before deciding whether to revoke his license. Instead, it reviewed Thompson's immoral conduct and considered its effect on the education of students, as well as the effect on teachers, parents and the public. In considering the effect on the school community, the superintendent properly considered the role a teacher plays in the education system. This is simply a way of measuring the seriousness of the immoral conduct and whether it affects the person's effectiveness as a teacher. It is especially appropriate when the immoral conduct does not involve an interaction between the teacher and pupil.

Here, the superintendent concluded that Thompson's repeated criminal and immoral conduct was serious, open and notorious. It involved crimes against the sexual morality of this state as the people of Wisconsin denounced in ch. 944 of our statutes. *See* ch. 944, STATS., Crimes Against Sexual Morality. Was Thompson's function as a teacher impaired by his immoral conduct when he openly sexually assaulted two men against their will? Absolutely. At Thompson's revocation hearing, educational experts testified that in their opinion Thompson could not function as a teacher and that his conduct had an adverse impact on the school community. Thus, the record supports the superintendent's findings.

Thompson's propensities and personal qualities exhibited by his repeated criminal and immoral con-

duct are manifestly inconsistent with the responsibilities and qualities that the students and public have a right to demand from teachers. I see nothing wrong with the superintendent considering the effect of the immoral conduct on the students, teachers, parents and the public as a factor in its consideration of whether there was a nexus. In fact, the superintendent did exactly what the majority recommends on remand. He examined the severity of the immoral conduct and its impact on the health, welfare, safety or education of the pupils. To say that the superintendent cannot look at the community's likely reaction to the immoral conduct ignores reality and what the community reasonably expects from its teachers.

I would therefore conclude that there is substantial evidence to support the superintendent's conclusion that there was a nexus between Thompson's immoral conduct and the health, welfare or education of pupils. Whether Thompson is now fit to teach is a matter better addressed at any reinstatement proceedings. Accordingly, I would affirm the superintendent's decision to revoke Thompson's license and reverse the judgment of the trial court.