Jerry Lu EPSTEIN, Petitioner-Appellant,

v.

John T. BENSON, State Superintendent of Public Instruction, in his official capacity and Nancy F. Holloway, Executive Assistant to the State Superintendent of Public Instruction, in her official capacity, the Department of Public Instruction, State of Wisconsin, Respondents-Respondents.

Court of Appeals

*No. 99–1338. Submitted on briefs June 5, 2000.—Decided August 29, 2000.*

## 2000 WI App 195

(Also reported in 618 N.W.2d 224.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Bruce Meredith,* of the Wisconsin Education Association Council, of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Bruce A. Olsen,* assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J.  Jerry Lu Epstein appeals from the circuit court order affirming the 1998 administrative decision of the Department of Public Instruction (DPI) revoking all of her DPI-issued licenses.[1] Challenging DPI's decision, Epstein presents

---

[1] Epstein held three licenses issued by DPI: a five-year license as a teacher for hearing-impaired (grades K–12); a five-year license as a teacher for elementary education (grades 1–6); and a lifetime license as a school social worker. In 1994, DPI revoked her two teaching licenses, but not her school social

numerous arguments, several of which overlap. We focus on three of her theories: (1) that DPI's decision "was an abuse of departmental discretion in light of the record as a whole"; (2) that Superintendent John T. Benson's executive assistant "subtly changed several factual findings without consulting the examiner," thus rendering the decision "procedurally flawed"; and (3) that DPI erred, as a matter of law, in concluding that her actions were immoral.

¶ 2. We conclude that DPI's conduct following this court's remand of Epstein's previous appeal was unconscionable; its delays and evasions fully support Epstein's request for reversal "in light of the record as a whole." We also conclude that DPI's decision was procedurally flawed; Superintendent Benson's executive assistant, to whom he delegated the decision-making authority in this case, did not confer with the hearing examiner before rendering her decision and, therefore, improperly altered at least one of the hearing examiner's most significant factual findings—a finding inextricably connected to the assessment of Epstein's credibility and to the ultimate determination of whether Epstein's conduct was immoral. Finally, we conclude that the evidence does not support DPI's determination that Epstein's conduct was immoral. For all these reasons, we reverse.

worker license; in 1998, however, DPI revoked all three. References to "license" and "licenses" appear throughout the record and the parties' briefs, without any apparent significance being attached to this distinction, or to the difference between Epstein's licenses for teaching and social work, or to the difference between the revocation of two licenses in 1994 and three in 1998. Therefore, for convenience in this opinion, we will simply refer to Epstein's "license."

## I. BACKGROUND

¶ 3.   In our *per curiam* opinion in the previous appeal emanating from DPI's 1994 revocation of Epstein's license, we summarized the factual background and procedural history:

On June 30, 1992, Epstein[, a Whitefish Bay public school employee,] shot and killed [Lee King,] her former son-in-law[,] when he made threats against the li[ves] of her daughter and grandchildren while backing up his automobile . . . with the children in the rear seat and her daughter partially in the car. Epstein had access to a loaded gun because she was carrying it in her purse. She said the gun was in her purse because she was going to target practice later that day. She kept the gun in her home for protection and only carried it with her in her purse when going to target practice. Epstein was acquitted of all criminal charges arising out of this incident with the exception of a carrying a concealed weapon charge.

In April 1993, the Department of Public Instruction issued a notice of probable cause and intent to revoke Epstein's [DPI-issued] licenses. A three-day hearing was held before hearing examiner Dr. Julie Underwood, Esq. Superintendent Benson did not attend any portion of the hearing. The Department was represented by Attorney Kathleen Kalashian. The hearing examiner issued her decision in January 1994, finding that the Department had not proven by clear and convincing evidence that Epstein had committed an immoral act[,] and that Epstein's actions in this shooting incident did not have a nexus to, or endanger, the health, welfare, education or safety of any pupil.

Kalashian filed objections to the hearing examiner's decision and submitted alternate findings of

fact and conclusions of law recommending that Epstein's teaching licenses be revoked. In February 1994, Benson summarily reversed the hearing examiner's decision and adopted Kalashian's alternative conclusions and decision. He neither gave Epstein an opportunity to object to this new decision nor did he set forth any explanation for his departure from the hearing examiner's decision. Epstein filed a [WIS. STAT. ch. 227] appeal. The circuit court reversed Benson's decision because of his failure to comply with certain statutory requirements.

*Epstein v. Benson*, No. 95–0522, unpublished slip op. at 2–3 (Wis. Ct. App. October 24, 1995) (footnote omitted).

¶ 4.  Superintendent Benson appealed, arguing that he had not violated any statutory provisions in issuing his final decision. *See id.* at 3–4. We rejected his argument. Adopting portions of the circuit court's decision, we concluded:

> "What [WIS. STAT. § ] 227.46(6) requires is that the *decision-maker and those participating in the proposed or final decision* act impartially. Therefore, since Kalashian was, in effect, the DPI's prosecutor at Epstein's hearing, she could not then be the person [reviewing] the record and submit[ting] a proposed decision. The plain language of the statute requires that someone other than an advocate at the hearing prepare the proposed decision. Therefore, it was for the Superintendent to either review the record himself or assign some other—impartial—person in his office to do it for him and advise him on the matter. A proposed decision—if adverse to Epstein—should then have been served upon her pursuant to § 227.46(4) so she could react to it and argue her case to the person

who would render the decision, presumably Benson."

*Id.* at 6 (quoting circuit court decision).

¶ 5.   We further clarified, among other things, that although Kalashian was free to submit her findings, conclusions, and decision, Benson could not adopt them without examining the record. *See id.* at 7. We concluded, therefore, that "because Benson adopted [Kalashian's] position without having any independent knowledge of the particular circumstances[,] . . . the decision was not an impartial one." *Id.* Accordingly, we affirmed the circuit court's order and remanded the case to the circuit court "with directions to remand it to the administrative forum to correct the statutory violations that occurred." *See id.* at 7–8.

¶ 6.   On November 30, 1995, remittitur to the circuit court was entered. On January 30, 1996, the circuit court entered an order remanding the case "to the State Superintendent for further proceedings consistent with the Court of Appeals' October 24, 1995, decision." On May 26, 1998, DPI again revoked Epstein's license, leading to circuit court review and this appeal.

## II.   PROCEEDINGS FOLLOWING REMAND

¶ 7.   During the period between this court's 1995 decision (affirming the circuit court's reversal of DPI's 1994 decision revoking Epstein's license) and DPI's 1998 decision (again revoking Epstein's license), Epstein and her attorney, Bruce Meredith, were not idle. They attempted to: (1) renew her license; and (2) either confirm her status as a licensed teacher or, if DPI deemed her unlicensed based on the 1994 revocation, gain a hearing to challenge the revocation. DPI, however, failed to comply with the circuit court order

issued subsequent to remittitur. Although tedious to track, DPI's dilatory and duplicitous conduct deserves detailed exposure.

¶ 8. On August 29, 1996, Peter J. Burke, then the DPI Director of Planning and Process (Division for Learning Support: Instructional Services), wrote to Epstein, acknowledging that DPI had received her application for license renewal on July 2, 1996. His letter stated:

> Currently, the status of your licensure with this Department remains revoked. Your license has not been reinstated as a result of either the circuit court or the appeals court decision. *The Department is presently involved in complying with the remittitur from circuit court.* You will be notified of further processing. Because your license is revoked, you are unable to renew your license at this time.

(Emphasis added.)

¶ 9. On September 6, 1996, Meredith responded to Burke, pointing out that his August 29 letter "misstate[d] the judicial history of Ms. Epstein's case." Meredith correctly explained that this court's 1995 decision had affirmed the circuit court's reversal of DPI's decision that revoked Epstein's license and, therefore, that "Ms. Epstein *has* a license, since a license cannot be taken away without a decision by the Superintendent ordering revocation." Additionally, Meredith wrote:

> The Court of Appeals did give the State Superintendent an opportunity to appropriately issue a decision; however, it has been almost a year since the Court of Appeals' decision, and over eight months since the [circuit court] Order [remanding the case to the State Superintendent for correction of statutory violations]. Ms. Epstein and I assumed

the Superintendent had chosen not to take any action and simply allow Ms. Epstein to continue to hold her license as she did before the State Superintendent's decision.

. . . .

It should be remembered that the Superintendent's decision was reversed because of his failure to follow the clear statutory mandates with respect to the procedure for revoking a teacher's license after receiving a hearing officer's recommendation against revocation. It appears *the Superintendent is now compounding these errors by claiming the right to keep someone from teaching because of departmental non-action even in the face of a court order remanding the case with directions.* Certainly, sitting on this case for the [amount] of time the Superintendent has does not constitute "proceedings consistent with the Court of Appeals['] October 24, 1995 decision."

I hope this letter will prompt immediate action on the department's renewal of Ms. Epstein's teaching license. There has been no valid revocation of her prior license and, therefore, she is entitled to be issued a new license.

(Emphasis added.)

¶ 10.   By letter dated September 18, 1996, Burke, responding to Meredith, admitted his error. He wrote, "At the time your [September 6, 1996] letter was received I was drafting this present letter indicating my awareness of the inaccuracy in my original letter." Burke then conceded: "You[ ] are correct in stating that since the Court of Appeals reversed the prior action of the department resulting in revocation of Ms. Epstein's licenses, it was inaccurate to characterize the status of Ms. Epstein's licenses as revoked. Accordingly, Ms. Epstein's life license remains effective."

¶ 11.   But Epstein still was not out of the DPI woods. Burke's letter continued:

> With respect to Ms. Epstein's other licenses, I note that Ms. Epstein's application for license renewal was received by the bank [sic] on or about June 18th, 1996. The application was returned to Ms. Epstein as incomplete since a check for the renewal fee was not included. This was in accord with customary department practice[;] that is[,] applications are not deemed officially received until they are complete. This department received Ms. Epstein's completed application for renewal on July 2, 1996. Applications for license renewal that are received after June 30 of any given year are deemed untimely and result in an expired license. Accordingly, the status of Ms. Epstein's other licenses is therefore expired.
>
> Ms. Epstein's application for license renewal is being denied for the reasons set forth in the Notice of Probable Cause and Intent to Revoke License dated April 8, 1993. If Ms. Epstein would like a hearing on the denial of her application for renewal she may write to me with that request within 30 days.

Thus, it appears that DPI was refusing to renew Epstein's license for either or both of two reasons: (1) her alleged failure, in 1996, to timely pay the renewal fee required to complete her application; and (2) her conduct related to the 1992 shooting, which originally led DPI to revoke her license in 1994.

¶ 12.   Additionally, in his September 18 letter, Burke went on to explain that some delay in proceeding with Epstein's case had come about because "Milwaukee County had misplaced a large portion of the record." He added, however, that "[t]he record is now complete" and that "Mr. Benson is prepared to begin

his review of the record at this time." He assured Meredith that *"the Department is in the process of complying with the remittitur from circuit court so that this matter may be brought to a conclusion."* (Emphasis added.)

¶ 13.   By letter dated September 23, 1996, Meredith promptly responded. Revealing his doubts about Burke's explanations, he wrote:

> It may well be that the department has a policy of not deeming applications received until they are complete; however, I would find it very unlikely that the department does not automatically reinstate licenses in situations similar to Ms. Epstein's, where an incomplete application was filed prior to the deadline, and a completed application arises [sic] shortly thereafter. If I am mistaken in this assumption, please let me know immediately.
>
> If you do not have a general policy for license reinstatement when an incomplete application is received, then please provide me with copies of the final department disposition of all applications which were received by the department before the expiration dates and returned by the department to the individuals as incomplete, where the individual subsequently completed the application after the expiration date, since January 1, 1994.
>
> In addition, in your letter you indicate that the court was unable to provide the department with a complete copy of the transcript in Ms. Epstein's proceedings. Please provide me with all copies of correspondence sent between the department and the circuit court with respect to the record.
>
> Finally, please provide me with all nonprivileged correspondence within the department involving Ms. Epstein's license occurring after the date of the court of appeals decision in her case (October 24, 1995).
>
> . . . .

In your letter, you indicate that Ms. Epstein should request a hearing for reinstatement of her license, other than her life license. In order to preserve Ms. Epstein's claims, please consider this a request for such a hearing. However, please also be advised that Ms. Epstein will consider taking legal action, either in terms of a writ of mandamus or prohibition, should the department attempt to schedule such a hearing. It is obvious that the department is attempting to create a new fictitious dispute when, in fact, its decision to not renew Ms. Epstein's licenses is part and parcel of the prior departmental proceedings in this case which were reversed by the court of appeals. We believe that any attempt to conduct a hearing on Ms. Epstein's alleged "reapplication" is not only indefensible as a matter of law but would be in direct violation of the remand order by both the court of appeals and circuit court in this case and, therefore, could place the department in contempt of court.[2]

(Footnote added.)

¶ 14. One week later, on September 30, 1996, Meredith wrote Burke again—this time with added ammunition supporting his suspicions about what he had labeled as DPI's "fictitious dispute" about Epstein's alleged incomplete renewal application. Meredith's letter explained:

I have just received a copy of Ms. Epstein's canceled check representing her license renewal fees. It

---

[2] In these letters of September 18 and 23, 1996, Burke and Meredith do distinguish between Epstein's five-year teaching licenses and her lifetime school social worker license. Ultimately, however, neither Burke nor Meredith connected any consequence to the distinction and the balance of their correspondence continued to address Epstein's "license" revocation. See ¶ 1 n.1, supra.

appears that the check was mailed to the department on or about June 22, 1996. It is surprising that it took so long to be delivered to the department. Did you retain a copy of Ms. Epstein's envelope? If so, please forward a copy of that envelope, as well as any correspondence accompanying her check, to me.

¶ 15. By letter dated October 8, 1996, Burke responded to Meredith's letters of September 23 and 30:

[Y]our assumption that the department automatically issues licenses to individuals whose completed applications are received after the July 1 deadline is incorrect. By way of example, enclosed you will find copies of completed applications received by the department after July 1, 1996 that have not been automatically renewed. *I can find no examples of an incomplete application that arrived before the June 30 deadline, but then was completed after July 1, where the department subsequently denied that license.*
You seem to be under the mistaken impression that the department has denied Ms. Epstein's renewal application because it was not received on time. Such is not the case. *The department would have denied Ms. Epstein's request for renewal regardless of when it was received* for the reasons set forth in my September 18 letter. My discussion of the June 30 deadline was provided only to explain the current *status* of her license, regardless of whether her request to renew is granted or denied.
With respect to your request for copies of department correspondence with Milwaukee County circuit court, there exists no such correspondence. However, I have included a copy of a telephone message from the Clerk of Courts concerning the retrieval of the record.

Next, I am not aware of any non-privileged intra-department correspondence that occurred after the court of appeals decision.

Finally, with respect to the inquiry in your September 30, 1996 letter, the department does not retain the envelopes from license applications. I am uncertain why it may have taken a certain number of days for the bank to forward Ms. Epstein's application to us after receiving her check. The department cannot control bank procedures. However, the department does not use the postmark on the envelope to establish the official receipt date. Rather, the date the application is dated stamped [sic] is the official receipt date for departmental purposes.

(Italicized emphases added.)

¶ 16.  Without belaboring the several Meredith-Burke debates, we note Burke's most significant concessions: that he could find no other examples of renewal applications being denied due to the late arrival of the renewal fee, and that "[t]he department would have denied Ms. Epstein's request for renewal regardless of when it was received." Thus, quite remarkably, with this October 8, 1996 letter, DPI seems to have been: (1) backing off from its "incomplete application" rationale for denying Epstein's license renewal; (2) reiterating its 1994 rationale, which had culminated in the DPI decision that had been reversed; and (3) possibly leaning back on its "incomplete application" rationale that Epstein's "current status" was unlicensed, "regardless of whether her request to renew" would be granted or denied.

¶ 17.  Almost one more year passed with no further DPI action. Finally, on September 9, 1997, after a recent contact with Epstein regarding her license status, Meredith wrote directly to Superintendent

Benson: "I indicated to [Ms. Epstein] that, due to the substantial lapse of time since the Court of Appeals decision . . ., I assume[d] the Department was not intending to proceed. I do request from you, however, confirmation of this fact." And on September 10, 1997, Epstein personally wrote to Benson, expressing her frustration:

> About July, 1992 you started a proceeding to take away my teaching licenses for five years. January 21, 1994 the Hearing Examiner you assigned ruled that my license issued by the Wisconsin Department of Public Instruction should not be revoked. However, you have kept this case in litigation and I have not been issued my teaching license.
>
> Since the five years is over, I assume that I will be receiving my teaching licenses. I would appreciate having my teaching licenses back. This "continuing process" has caused me stress which I hope will now come to an end, and my teaching licenses will be issued.
>
> Once I have my Wisconsin teaching licenses I hope that I and my family will be able to put this tragedy behind us. Five years of litigation pressure hopefully will be enough pain and penalty.

¶ 18.    Still, even these letters were not enough to move DPI. More than three additional months passed. Then, on December 22, 1997, Meredith, having received no reply to his September 9 letter, wrote Benson again, seeking notification of "the Department's position" regarding "the status of [Epstein's] teaching license."

¶ 19.    The next month, DPI finally replied. In a letter dated January 8, 1998, Burke, then DPI Director of Teacher Education and Licensing (Division for

Learning Support: Instructional Services), wrote Meredith:

> This letter is in response to your September 9, 1997, query regarding the status of the license issue of Ms. Jerry Lu Epstein. I have consulted with State Superintendent John Benson about this case and must report that, to date, *no further action has been taken.*
>
> Thus the original order of revocation remains reversed as ordered by the Circuit Court and *no action has taken place on the remand directed in that order.* This is not to say that an action in this case will not be forthcoming; it is only to confirm that *the order of remand has not been fulfilled* at this time.
>
> Rest assured that you and your client will be contacted immediately should this status change.

(Emphases added.)

¶ 20.   But DPI still did nothing, leaving Epstein with neither her license nor a license reinstatement hearing. That status remained unchanged for several more months.

¶ 21.   On May 5, 1998, Meredith again wrote Benson, asserting that DPI "has consistently refused to schedule a hearing or take other action regarding Ms. Epstein's licenses." Meredith closed the letter, "Please let me know immediately what action you plan to take in this case."

¶ 22.   Finally, on May 11, 1998, in response to Meredith's May 5 letter, Nancy F. Holloway, Benson's executive assistant, wrote that Benson had appointed her "to be the decision maker in this case," that she was "in the process of reviewing the record," and that she would issue her decision no later than May 26, 1998. She did so. In her May 26 decision, Holloway revoked

Epstein's license, concluding that Epstein's actions—both "carr[ying] a concealed and dangerous weapon . . . in the presence of and around public places and children," and shooting and killing King "in close proximity to two children and an adult female"—constituted immoral conduct under WIS. STAT. § 115.31(1)(c),[3] by being "beyond acceptable moral or ethical standards" and endangering the "safety, health and welfare of [Epstein's] school[-]aged grandchildren who were in the car."

¶ 23. Epstein appealed. The circuit court, in its March 23, 1999 memorandum decision, rejected DPI's reliance on the carrying-concealed-weapon offense as a basis for license revocation. While essentially agreeing that, in theory, the carrying of a concealed weapon could constitute conduct "that is contrary to commonly accepted moral or ethical standards," the circuit court concluded that DPI had erred by applying the "role model" standard, rejected by this court in *Thompson v. Wisconsin Department of Public Instruction*, 197 Wis. 2d 688, 541 N.W.2d 182 (Ct. App. 1995), in determining

---

[3] WISCONSIN STAT. § 115.31 (1991–92) defines " '[i]mmoral conduct' " as "conduct or behavior that is contrary to commonly accepted moral or ethical standards and that endangers the health, safety, welfare or education of any pupil." WIS. STAT. § 115.31(1)(c). It also provides the state superintendent with discretionary authority to revoke "after written notice of the charges and of an opportunity for defense, any license granted by the state superintendent" for "immoral conduct on the part of the licensee," except as specified under the statutory provision mandating revocation of licenses following particular felony convictions. *See* WIS. STAT. § 115.31(2). The state superintendent was required to abide by the "clear and convincing evidence" standard when deciding to revoke Epstein's license on the basis of immoral conduct. See WIS. ADMIN. CODE § PI 3.04(2)(a) (1997).

whether a nexus existed between Epstein's conduct and endangerment of "the health, safety, welfare or education of any pupil."[4]

¶ 24.   The circuit court affirmed the license revocation, however, on the basis of the shooting. While acknowledging that "Epstein found herself in an exceptional situation on the day in question," the court determined that "[i]t does not strain logic to conclude that [Epstein's] conduct was contrary to commonly accepted moral and ethical standards," and that Holloway's "conclusion that there was a nexus between this conduct and the health, safety, welfare or education of students was reasonable."

## III.   STANDARDS OF REVIEW

¶ 25.   "Constitutional due process protections apply to procedures affecting licenses necessary to engage in one's livelihood . . . ." *Tavern League of Wis. v. City of Madison*, 131 Wis. 2d 477, 489, 389 N.W.2d 54 (Ct. App. 1986). An order "entered by an administrative board in a *quasi*-judicial proceeding wherein the board has denied a party . . . due process is void and the aggrieved party is entitled to an appropriate proceeding (if . . . prejudiced by the denial) to have the . . . order set aside." *Folding Furniture Works, Inc. v. Wisconsin Labor Relations Bd.*, 232 Wis. 170, 191, 285 N.W. 851 (1939). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

---

[4] In a footnote, however, the circuit court commented: "Had the proper nexus standard been applied by the Superintendent, this Court would likely have affirmed the revocation based upon this charge."

¶ 26. We review DPI's decision, not that of the circuit court. *See Thompson*, 197 Wis. 2d at 697. "Our scope of review is identical to that of the [circuit] court." *Id.* As we have explained:

A different standard of review for agency decisions is applied for questions of law and questions of fact. If presented with a question of fact, we employ the "substantial evidence" standard. Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. An agency's decision may be set aside by a reviewing court only when, upon examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person could not have reached the decision from the evidence and its inferences.

If the issue presents a question of law, we must "set aside or modify the agency action if [we] find[ ] that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or [we] shall remand the case to the agency for further action under a correct interpretation of the provision of law." To this end, we apply one of three levels of deference to the conclusion of the agency: "great weight," "due weight" or "de novo."

The great weight standard is the highest degree of deference. It is applied when the agency is charged with administration of the statute at issue, the agency's interpretation is based on "its expertise or specialized knowledge," the interpretation provides "uniformity and consistency in the application of the statute," and the agency conclusion or interpretation is "long standing." If the foregoing criteria are met, we will sustain the agency's interpretation even if an equally or more reasonable interpretation is offered.

*Sea View Estates Beach Club v. DNR*, 223 Wis. 2d 138, 148–49, 588 N.W.2d 667 (Ct. App. 1998) (citations omitted), *review denied*, 225 Wis. 2d 489, 594 N.W.2d 383 (1999).

¶ 27. Reviewing whether DPI correctly concluded that Epstein engaged in immoral conduct, we give great weight to the department's decision. *See Thompson*, 197 Wis. 2d at 698.[5] Nevertheless, we reject

---

[5] Determining the correct standard of review of DPI's decision requires a very careful reading of *Thompson v. Wisconsin Department of Public Instruction*, 197 Wis. 2d 688, 541 N.W.2d 182 (Ct. App. 1995). In that case, DPI revoked Thompson's teaching license based on statutory revocation provisions and corresponding portions of the administrative code. *See id.* at 696. The relevant statute allowed revocation of a teaching license for immoral conduct. *See* WIS. STAT. § 118.19(5) (1989–90). WISCONSIN ADMIN. CODE § PI 3.04(1)(a) (1989) defined immoral conduct as "conduct or behavior which is contrary to commonly accepted moral or ethical standards." WISCONSIN ADMIN. CODE § PI 3.04(2)(a) (1989) allowed revocation of a teaching license "for immoral conduct if there is clear and convincing evidence that the person engaged in the immoral conduct and there is a nexus between the immoral conduct and the health, welfare, safety or education of any pupil."

In *Thompson*, we concluded that "due weight," not "great weight," was the appropriate deference to be given to the superintendent's revocation of a teacher's license based on the teacher's immoral conduct and the nexus between that conduct and "the health, welfare, safety or education of any pupil." *See Thompson*, 197 Wis. 2d at 698. In doing so, we merged the superintendent's two determinations: (1) that the teacher engaged in "immoral conduct"; and (2) that the conduct had the required nexus to "the health, welfare, safety or education of any pupil." *See id.* Our discussion surrounding our conclusion, however, implied that, because the superintendent had vast experience in addressing the question of immoral conduct in conjunction with its nexus to "the health, welfare, safety or

DPI's determination that Epstein's conduct was immoral.

## IV.  UNCONSCIONABLE CONDUCT

¶ 28.  Epstein challenges "the unconscionable pattern of delay and deception which kept [her] 'in limbo' for over two and one-half years, thereby effectively preventing her from moving forward with a reinstatement hearing in which she could demonstrate that her current condition no longer warranted keeping her out of the teaching profession." The record provides overwhelming support for Epstein's challenge.

¶ 29.  The Meredith/Epstein/Burke/Benson correspondence confirms DPI's unconscionable conduct. DPI failed to promptly respond to Meredith's and Epstein's reasonable inquiries and requests, provided some inaccurate and inconsistent answers, and failed to promptly comply with court orders. As a result,

---

education of any pupil," we would have given great weight to that determination if that, alone, had been the element on appeal. *See id.* at 697–99. But, in *Thompson,* because the superintendent had had substantial experience in addressing nexus questions, *but no experience in applying the role model standard to a nexus question,* and because that latter element was the one on appeal, we concluded that "due weight" deference would be appropriate. *See id.* at 698–99.

Thus, while our standard of review, based on *Thompson,* may not be absolutely clear, it appears that, consistent with *Thompson,* and in fairness to DPI, we should show "great weight" deference to DPI's determination of Epstein's immoral conduct: In this case, because we ultimately reject DPI's determination that Epstein engaged in conduct that was "contrary to commonly accepted moral or ethical standards," we need not go on to apply what, based on *Thompson,* would be "great weight" deference to DPI's nexus determination.

Epstein, in effect, remained both unlicensed and unable to become licensed despite the absence of a valid license revocation. And, by virtue of DPI's delays and evasions, Epstein has, in effect, remained unlicensed since February 18, 1994, when Superintendent Benson reversed the hearing examiner's original decision declining to revoke Epstein's license.

■

¶ 30. Thus, even setting aside the rather obvious question of whether Superintendent Benson's appointment of his own executive assistant complied with this court's order that he appoint "some other—impartial—person in his office" to review Epstein's case, we conclude that DPI's conduct failed to provide even the most rudimentary "due process protections appl[icable] to procedures affecting licenses necessary to engage in one's livelihood." *See Tavern League of Wis.*, 131 Wis. 2d at 489.[6]

---

[6] DPI argues that we should interpret Epstein's challenge to its conduct as a "waiver- or estoppel-type argument" and reject it because, as the supreme court explained in *Department of Revenue v. Moebius Printing Co.*, 89 Wis. 2d 610, 639, 279 N.W.2d 213 (1979), "estoppel doctrine" generally may not be "invoked against the government when the application of the doctrine interferes with the police power for the protection of the public health, safety or general welfare." DPI, however, fails to acknowledge that this principle is not absolute. The supreme court noted that, despite the general preclusion of an estoppel defense against the government:

> [W]e have recognized that estoppel may be available as a defense against the government if the government's conduct would work a serious injustice and if the public's interest would not be unduly harmed by the imposition of estoppel. In each case the court must balance the injustice that might be caused if the estoppel doctrine is not applied against the public interests at stake if the doctrine is applied.

## V. ALTERED FACTUAL FINDING / PROCEDURALLY DEFECTIVE DECISION

¶ 31.  As noted, Epstein also challenges DPI's most recent decision on additional grounds. She contends that "the department's decision still remains procedurally flawed in that the executive assistant [Holloway] subtly changed several factual findings without consulting the examiner [Underwood]." At least in one important respect, Epstein is correct (though she may have been generous in terming Holloway's change "subtl[e]").

¶ 32.  Although we cannot know for sure whether, or to what extent, a particular factual finding influenced Holloway's decision, one finding, articulated

. . . .
. . . In each case the court must determine whether justice requires the application of the doctrine of estoppel; the determination of whether the state is estopped must be made on a case-by-case basis.

*Id.* at 638–39, 641 (citations and footnotes omitted).

Accepting, for the sake of argument, DPI's view that Epstein's argument essentially presents an estoppel theory, we have balanced the competing interests. Here, clearly, "the government's conduct" already has "work[ed] a serious injustice" by denying Epstein the opportunity to engage in her chosen profession while simultaneously precluding her from challenging that denial. And, just as clearly, "the public's interest would not be unduly harmed by the imposition of estoppel." After all, this court serves the public interest by holding DPI accountable for its unconscionable conduct, and by ensuring compliance with court orders. And, because the evidence failed to establish a proper basis for Epstein's license revocation, this court serves the public interest by ensuring that the improper license revocation is voided. Thus we have concluded that this case is an exceptional one in which "justice requires the application of the doctrine of estoppel." *See id.* at 641.

twice in Holloway's written decision, seems significant. Holloway, after reviewing the record of the original hearing, but without conferring with Underwood,[7] wrote: "The car accelerated and Epstein shot the gun. *She claimed to aim at his leg, however, according to the Medical Examiner, Lee was shot below the rib cage at a distance of 2–3 feet.*" (Emphasis added.) Five pages later, Holloway wrote, "*Epstein claimed to be aiming at Lee's legs but shot him just below the rib cage.*" (Emphasis added.) But in her 1994 decision declining to revoke Epstein's license, Underwood found: "Epstein . . . ran to the passenger's side of the car, put the gun through the window, *aiming at Lee's legs,* and with her other hand pushed her daughter out of the way. Again[,] she told Lee to stop. The car accelerated, and the gun went off." (Emphasis added.)

¶ 33. Rather transparently, Holloway's references to Epstein's *claim* regarding her *aim* reflect a skeptical view of Epstein's account of the shooting. This alteration of Underwood's finding that Epstein was "aiming at Lee's legs" was, therefore, an alteration based on at least an implicit assessment of Epstein's credibility. Before making such a modification, Holloway was required to confer with Underwood. *See City of Appleton v. DILHR,* 67 Wis. 2d 162, 169–70, 226 N.W.2d 497 (1975) (before department reverses hearing examiner's determination, on basis of assessment of witness credibility, department must confer with hearing examiner because "due process require[s] that the record affirmatively show that the [department] had the benefit of the examiner's personal impressions of the material witnesses"). Holloway failed to do so.

---

[7] DPI concedes, "It is undisputed that Ms. Holloway did not consult with the hearing examiner prior to issuing the May 26, 1998, decision."

Additionally, Holloway's decision failed to include "an explanation of the basis for each variance" from the hearing examiner's decision. *See* WIS. STAT. § 227.46(2) (1997–98).[8] Consequently, DPI's 1998 revocation of Epstein's license was procedurally defective.

¶ 34. Depending on the significance Holloway attached to the altered finding, the modification may have been material to her conclusion. The apparent importance of Holloway's alteration is best understood when examined in the context of her factual findings immediately preceding her first reference to Epstein's claim regarding aiming at King:

> Epstein heard the threats and saw her daughter and granddaughters in the car as it was moving out of the driveway. At this time, she believed that the lives of her daughter and granddaughters were in jeopardy. She ran to the car and yelled to Lee. He responded with threats to Sherie and the children's lives. Epstein then reached into her purse and pulled out the gun, shouting at him to stop—"Stop, Lee, I've got a gun." She ran to the back tire, aimed and shot the tire. She yelled at him again to stop, aimed and shot the tire again. The car continued to move. Epstein then pulled the lever back on the gun and reached through the passenger side window of the moving car. She reached over her daughter's body in the passenger side of the car and aimed the gun at Lee. Again, she told Lee to stop. The car accelerated and Epstein shot the gun.

¶ 35. *Accepting Holloway's factual findings*, and dissecting them, we see that Epstein took seven steps

---

[8] "If an agency's decision varies in any respect from the decision of the hearing examiner, the agency's decision shall include an explanation of the basis for each variance." WIS. STAT. § 227.46(2) (1997–98).

obviously intended to *avoid* shooting King while protecting her daughter and granddaughters. She: (1) "yelled to Lee"; (2) "shout[ed] at him to stop"—"Stop, Lee, I've got a gun."; (3) "shot the tire"; (4) "yelled at him again to stop"; (5) "shot the tire again"; (6) "aimed the gun at Lee"; and (7) "told Lee to stop." Even after taking these seven steps, Epstein, according to *Underwood's* findings, still aimed at King's legs before shooting him. But according to *Holloway's* altered finding, Epstein may not have aimed at King's legs; she only *claimed* to have done so.

¶ 36.   We conclude that Holloway's altered finding—implicitly addressing Epstein's credibility and explicitly addressing the critical issue of whether she was attempting to kill or only wound King—logically related to the ultimate determination of whether Epstein's conduct was immoral. Thus, even assuming that Superintendent Benson's own executive assistant could be impartial, *see* WIS. STAT. § 227.46(6) (1997–98), her methodology was legally flawed and violative of due process. Once again, DPI's revocation of Epstein's license was improper.

## VI.   IMMORAL CONDUCT

¶ 37.   Epstein also challenges DPI's determination that her conduct was immoral. Once again, her arguments are strong.

¶ 38.   If due process is afforded a DPI licensee, "any license granted by the state superintendent may be revoked by the state superintendent for . . . immoral conduct on the part of the licensee." *See* WIS. STAT. § 115.31(2) (1997–98). When Epstein shot King, "immoral conduct" was defined as "conduct or behavior that is contrary to commonly accepted moral or ethical

standards and that endangers the health, safety, welfare or education of any pupil." WIS. STAT. § 115.31(1)(c) (1991–92).[9]

## A. The Shooting

¶ 39. DPI provides no authority supporting its unavoidable premise—that a woman attempting to protect the lives of her daughter and granddaughters acts "contrary to commonly accepted moral or ethical standards" by shooting their potential attacker after issuing numerous warnings and taking actions in an apparent attempt to avoid shooting or killing him. As Epstein argues:

> While all parties can speculate as to whether Epstein made matters better or worse by her actions, one matter is beyond speculation: *Epstein's actions in shooting Lee King to protect her family were not contrary to law and accepted morals.* The law and accepted morality give all persons, including teachers, the right to use force where they reasonably believe they or others face imminent harm. Both a jury and the Department's Hearing Officer found that Epstein reasonably perceived that her daughter and granddaughters were in grave danger, and responded in the manner she believed to be appropriate. Appellant cannot be

---

[9] At that time, the administrative code merely defined "immoral conduct" as "conduct or behavior which is contrary to commonly accepted moral or ethical standards." WIS. ADMIN. CODE § PI 3.04(1)(a) (1991). At all times relevant to Epstein's case, however, the administrative code provided that "[a] license may be revoked for immoral conduct if there is clear and convincing evidence that the person engaged in the immoral conduct and there is a nexus between the immoral conduct and the health, welfare, safety or education of any pupil." WIS. ADMIN. CODE § PI 3.04(2)(a) (1997).

deprived of her occupation because she chose to exercise that right, regardless of how the Department now claims a calm, detached person *should* have acted.

(Record references omitted.)

■

¶ 40.   As we have explained, whether Epstein aimed at King's legs or at another area of his body could, in the estimation of Underwood, Holloway, or others, relate to whether Epstein's conduct was "contrary to commonly accepted moral or ethical standards." Perhaps a "calm, detached person" could have retained the self-control to aim only at King's legs; perhaps not. Clearly, however, Epstein's action, as claimed by Epstein and found by Underwood—finally aiming at King's legs and shooting him—was not shown, by clear and convincing evidence, to be "contrary to commonly accepted moral or ethical standards." Thus we need not address whether Epstein's action endangered "the health, safety, welfare or education of any pupil," and we conclude, as a matter of law, that the evidence utterly fails to establish that Epstein's shooting of King was immoral.

### B.   Carrying a Concealed Weapon

¶ 41.   As DPI reminds us, however, its revocation of Epstein's license also rested on her carrying of a concealed weapon. Thus, notwithstanding the circuit court's rejection of the carrying-concealed-weapon rationale as the basis for concluding that Epstein's conduct was immoral, we must consider it. *See Sea View Estates Beach Club*, 223 Wis. 2d at 145 ("[W]e review the agency's decision, not the circuit court's.").

¶ 42.   DPI contends that when Epstein, just before the shooting, was carrying a loaded, concealed

weapon in her purse while accompanying her grand-daughters in their recreational activities, she was indeed engaging in "behavior that is contrary to commonly accepted moral or ethical standards." After all, DPI reasons, the conduct was criminal and potentially dangerous to children. There is, however, more to this story.

¶ 43. Epstein, according to the undisputed findings, intended to take the gun to a shooting range for target practice and did not realize that her method of carrying the gun was illegal. Hearing examiner Underwood concluded, therefore, that while "carrying a weapon with you on routine Saturday morning activities indicates a lack of common sense and may even indicate a cavalier attitude toward a loaded gun," Epstein's conduct was not "an act indicating moral turpitude." As a matter of law, Underwood was correct.

¶ 44. Carrying a concealed weapon violates Wisconsin law. *See* WIS. STAT. § 941.23 (1997–98) ("Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."). Whether it also violates Wisconsin's moral standards, however, is less clear. Indeed, one of the more frequent and frustrating sentencing dilemmas for Wisconsin criminal court judges is presented by defendants who have been convicted of carrying concealed weapons for purposes many view as legitimate—making nighttime bank deposits after closing their stores; seeking protection from serious, threatened attack; traveling to hunt or target shoot without awareness of the legal manner of transporting weapons. Thus, without excusing such conduct, we simply point out that although Wisconsin has declared that carrying a concealed weapon is a crime, that declaration does not necessarily make such conduct

immoral. *See Lee v. Wisconsin State Bd. of Dental Exam'rs*, 29 Wis. 2d 330, 338, 139 N.W.2d 61 (1966) (moral turpitude not necessarily involved in all acts prohibited by law).[10] As the supreme court recently

[10] In her brief to this court, Epstein, relying on Donnie E. Martin, *"Concealed Carry" Legislation and Workplace Violence: A Nightmare in Employers' Liability?*, 65 DEF. COUNS. J. 100, 101 (1998), asserts that "[i]n the majority of jurisdictions, [her] conduct would have been completely legal." Martin, a law student, wrote:

> Forty-three states and the District of Columbia now have legislation that legalizes the concealed possession of handguns or other deadly weapons. Thirteen states, as well as the District of Columbia, allow an individual to obtain a permit or license to carry a concealed [weapon] on a showing of some specific need. . . .
>
> . . . .
> . . . Only seven states continue complete prohibitions against individuals from carrying concealed deadly weapons. [sic]

*Id.* (footnotes omitted). *See also State v. Dundon*, 226 Wis. 2d 654, 673 & n.14, 594 N.W.2d 780 (1999) (noting that "[f]orty-three states have legislative enactments permitting citizens to carry concealed weapons under a variety of conditions and circumstances," and citing Martin's article).

We have not attempted to verify whether Martin's summary of the current status of carrying-concealed-weapons laws is accurate. We do recognize, however, that even in Wisconsin, where carrying a concealed weapon is against the law, it does not necessarily draw moral condemnation. Just recently, an incident in Milwaukee highlighted both the judicial dilemma and the community's view, at least to the extent that it may have been expressed in a newspaper editorial:

> In Jerusalem, where Milwaukee grocer Munir A. Hamdan was raised, it would be unusual for a merchant to carry a gun to work to protect himself and his business, according to Hamdan.
>
> But this is America, a place where violent crime, in contrast to Jerusalem's strife, has grown so common that even otherwise law-abiding people such as Hamdan feel they have no choice but to pack a pistol and pray they never have to use it.

declared, a person who carries a concealed weapon illegally "need not have culpability or bad purpose." *See*

Still, Hamdan was *not* abiding by the law last Nov. 26 when police stopped at his convenience store on W. Capitol Drive to inquire about beer sales. When officers asked whether he had a gun, Hamdan, who has been robbed numerous times at gunpoint, reached into his pocket and pulled out a loaded .32-caliber revolver. He was charged with carrying a concealed weapon.

That was a clear violation of the law, all right, but as Circuit Judge Robert Crawford noted, this was a difficult case. Hamdan claimed that officers had asked him many times previously whether he had a gun, and he had always said "yes." According to Hamdan, police never warned him against concealing it, and court records indicate that even the officers last November weren't certain immediately what to do.

Considering how many times Hamdan has been robbed at gunpoint over the years, it's hard to fault him for bringing a gun to work. Thus, Crawford was justified in fining the grocer only $1, rather than sending him to jail for the 30 days recommended by prosecutors.

Don't take this wrong. The law is the law. Police and prosecutors have no choice but to enforce it. But it's up to judges to weigh the facts in the cases before them and use judicial discretion, as Crawford did.

The judge conceded that he couldn't dismiss the case against Hamdan because it was, as Crawford put it, "legally sufficient." So, while Hamdan has to pay a fine of only $1, he still stands convicted. Moreover, the law was not compromised.

Many merchants in this city are, like Hamdan, in a tough spot. With guns seemingly everywhere, good folks sometimes feel compelled to carry weapons to protect themselves and their businesses, loved ones and possessions.

But that doesn't mean the answer is more guns, or allowing people to conceal them. With society locked in a high-stress mode, even the thought that the other guy might have a gun in his waistband can push some folks over the edge.

That's why Hamdan's offense can't go entirely unpunished. But there has to be enough leeway in the criminal justice system to give legitimately nervous shopkeepers such as Munir Hamdan a break.

*There's Sense in $1 Fine*, MILWAUKEE J. SENTINEL, July 21, 2000, at 14A. By quoting this editorial, we do not express agreement

747

*State v. Dundon*, 226 Wis. 2d 654, 664, 594 N.W.2d 780 (1999).

¶ 45. DPI argues that "[a] school district's message that students face serious consequences if they carry guns is undermined if students see that Ms. Epstein suffered no apparent serious consequences for carrying a concealed loaded weapon." Although we share DPI's concern about the message to students, DPI's lament is less legitimate than it might seem.

¶ 46. Granted, if DPI misrepresents this court's decision, it could be detrimental to students; an accurate account, however, would be highly instructive. An accurate account would refute DPI's preposterous suggestion that students would conclude that Epstein suffered "no apparent serious consequences"; on the contrary, students would learn that Epstein suffered a personal and family tragedy, that she was convicted of a crime, and that she has lost the opportunity to work in her chosen profession for the past six years. And an accurate account would help students learn that government, at times, behaves unconscionably, and that an independent and strong judiciary is essential to the preservation of both responsible government and individual rights.

¶ 47. Thus, while Epstein's carrying of a concealed weapon was illegal, and while her carrying of a *loaded* weapon while accompanying her grandchildren was particularly ill-advised, the evidence is not clear and convincing that her conduct was "contrary to commonly accepted moral or ethical standards." Therefore,

---

or disagreement—either with Judge Crawford's decision or with the editorial comments. We do, however, offer it as an illustration of a number of the competing concerns that, at times, may separate criminal conduct from immoral conduct.

we conclude, as a matter of law, that the evidence did not establish that Epstein's carrying of a concealed weapon constituted immoral conduct.

## VII.   CONCLUSION

¶ 48.   In the opening comments of Epstein's brief to this court, appellate counsel maintains that "Epstein has yet to receive a fair, thoughtful, and balanced decision on one [of] the most serious issues a citizen can face: whether she is morally fit to remain in her chosen profession." Hopefully, Epstein now has received the decision she deserved many years ago.

¶ 49.   Because DPI acted unconscionably, because DPI's unconscionable conduct denied Epstein due process of law, because DPI's decision was procedurally flawed, and because the evidence was not clear and convincing that Epstein's conduct was immoral, we remand this case to the circuit court for entry of an order directing DPI to immediately reinstate all of Epstein's DPI-issued licenses, retroactive to the dates of their original, respective revocations.

*By the Court.*—Order reversed and cause remanded with directions.