Robert F. Smith, d/b/a Mixx Night Club,
Petitioner-Respondent,

v.

City of Milwaukee and James R. Owczarski,
City Clerk, Respondents-Appellants.

Court of Appeals

*No. 2013AP2599. Submitted on briefs July 31, 2014.
—Decided August 26, 2014.*

2014 WI App 95

(Also reported in 854 N.W.2d 857.)

On behalf of the respondents-appellants, the cause was submitted on the briefs of *Grant Langley*, city attorney, and *Adam B. Stephens*, assistant city attorney.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *David Ziemer* of Glendale, and *Vincent J. Bobot* of Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. The City of Milwaukee appeals the judgment vacating the decision of the City of Milwaukee Common Council not to renew Robert F. Smith's Class B tavern license for Mixx Night Club. After the City decided not to renew Smith's license, the trial court—reviewing the nonrenewal decision *de novo,* pursuant to *Nowell v. City of Wausau*, 2012 WI App 100, 344 Wis. 2d 269, 823 N.W.2d 373 (*Nowell I*), which has since been overturned, *see Nowell v. City of Wausau*, 2013 WI 88, 351 Wis. 2d 1, 838 N.W.2d 852 (*Nowell I I*)—vacated the City's decision and instead ordered that the City renew Smith's license and suspend it for fifteen days. On appeal, the City, arguing that we should review its decision under the four-part certiorari review

outlined in *Nowell II*, contends that its nonrenewal must be affirmed because it meets the four-part *Nowell II* test. In other words, the City argues that its decision: kept within its jurisdiction; was lawful; was not arbitrary, oppressive, unreasonable or representative of its will rather than its judgment; and was supported by substantial evidence. Smith, on the other hand, argues that because *Nowell I* was in effect when the trial court reviewed the City's decision *de novo,* we should not apply the *Nowell II* standard of review here, but should instead review and affirm the trial court's decision rather than the City's. We agree with the City, and therefore must reverse the trial court and affirm the City's decision not to renew Smith's Class B tavern license.

### BACKGROUND

¶ 2. On December 11, 2012, Smith applied to renew his Class B tavern license for Mixx Nightclub. A hearing before the City License Committee was scheduled, and Smith was provided with a number of documents relevant to the hearing, including a police synopsis report summarizing numerous disturbances requiring police presence at Mixx between March 2011 and October 2012, and email correspondence from neighbors requesting that the club's license be suspended or revoked due to recurrent loud noise and violence in and around the club.

¶ 3. At Smith's license-renewal hearing, which took place on January 3, 2013, the police report summarizing the many disturbances at Mixx was read into the record, and Smith, his mother, and other witnesses testified. Smith acknowledged that closing time at Mixx was "pretty hectic," and agreed that one of the disturbances at the club involved a gun.

¶ 4. When the hearing concluded, the License Committee voted unanimously to recommend to the Common Council that Mixx's tavern license not be renewed. The Committee then prepared its findings of fact and conclusions of law. Thereafter, Smith filed his objections with the Common Council.

¶ 5. Shortly thereafter, on January 15, 2013, the Common Council adopted the nonrenewal recommendation of the License Committee and decided not to renew Smith's license. Smith then appealed to the trial court, which vacated the Common Council's decision.

¶ 6. The trial court vacated the Common Council's decision following a trial *de novo*, concluding that while Mixx Nightclub was disorderly or riotous contrary to Wis. Stat. § 125.12(2)(ag)2. (2011–12),[1] the Common Council's decision was excessive. The trial court instead imposed a fifteen-day suspension on the nightclub. The trial court ordered the trial *de novo* pursuant to this court's decision in *Nowell I*, which held that review of municipal licensing decisions under Wis. Stat. § 125.12(2)(d) was to be conducted *de novo, see Nowell I*, 344 Wis. 2d 269, ¶¶ 1, 12–13. As noted, however, *Nowell I* was later overturned by the supreme court, which held that certiorari is the correct standard of review. *See Nowell II*, 351 Wis. 2d 1, ¶¶ 3, 48.

¶ 7. The City now appeals the trial court's decision. Additional facts will be developed below.

### ANALYSIS

¶ 8. On appeal, the City argues that its decision not to renew Smith's tavern license must be affirmed because it meets the four-part certiorari criteria out-

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

lined in *Nowell II*. In other words, the City argues that its decision: kept within its jurisdiction; was lawful; was not arbitrary, oppressive, unreasonable or representative of its will rather than its judgment; and was supported by substantial evidence. Smith, on the other hand, argues that because *Nowell I* was in effect when the trial court reviewed the City's decision *de novo,* we should not apply the *Nowell II* standard of review or review the City's decision here, but should instead review and affirm the trial court's decision.

*(1) The correct standard to be applied is the certiorari standard.*

■

¶ 9. We turn first to the parties' arguments regarding the proper standard of review. Smith argues that we should not apply the certiorari standard of review to the City's decision, as mandated by *Nowell II*, because it was not the law at the time the case was heard before the trial court. Rather, according to Smith, *Nowell II* should only apply prospectively, and we should concern ourselves instead with the trial court's decision. The City, in contrast, argues that *Nowell II* should apply here because retroactive application of a rule of law is the general rule and there is no good reason to deviate from the general rule in this case. We agree with the City.

■■

¶ 10. Like all courts, we generally follow "the doctrine that a new rule of law applies retroactively." *See Heritage Farms, Inc. v. Markel Ins. Co.*, 2012 WI 26, ¶ 44, 339 Wis. 2d 125, 810 N.W.2d 465. The doctrine, known as the "Blackstonian doctrine," is usually implicated in cases in which the court decides to overrule or

785

repudiate an earlier decision, and is based on the theory that courts declare but do not make law. *See id.* In other words, when a decision is overruled, it does not become "bad" law; instead, it never *was* the law, "and the later pronouncement is regarded as the law from the beginning." *See id.* (citation and quotation marks omitted).

¶ 11. "Still, on occasion, this court has departed from the general rule of retroactivity and chosen instead to apply a new rule of law only prospectively." *See id.*, ¶ 45. The decision to apply a new rule of law prospectively, what is referred to as "sunbursting," is driven by the courts' "attempt to alleviate the unsettling effects of a party justifiably relying on a contrary view of the law." *See id.*

¶ 12. [I]n determining whether to apply a new rule of law prospectively instead of retrospectively, we consider three factors: (1) whether the holding [of the most recent case] establishes a new rule of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression, the resolution of which was not clearly foreshadowed; (2) whether retroactive application would further or impede the operation of the new rule; and (3) whether retroactive application could produce substantial inequitable results.

*Id.*

¶ 13. Applying these factors to the circumstances before us, we conclude that the rule of *Nowell II* was meant to be applied retroactively.

¶ 14. First, *Nowell II* neither overruled clear past precedent on which litigants may have relied nor decided an issue of first impression. *See Heritage Farms,*

786

*Inc.*, 339 Wis. 2d 125, ¶ 45. *Nowell II* reaffirmed what had been consistent practice throughout the state and reversed an opinion that was an outlier. As the supreme court pointed out in *Nowell II*, prior to *Nowell I* numerous decisions utilized the certiorari standard when reviewing municipal alcohol licensing decisions. *See Nowell II*, 351 Wis. 2d 1, ¶¶ 43–44 (citing *State ex rel. Smith v. City of Oak Creek*, 139 Wis. 2d 788, 407 N.W.2d 901 (1987); *Park 6 LLC v. City of Racine*, 2012 WI App 123, ¶ 6, 344 Wis. 2d 661, 824 N.W.2d 903; *Questions, Inc. v. City of Milwaukee*, 2011 WI App 126, ¶ 13, 336 Wis. 2d 654, 807 N.W.2d 131; *Wisconsin Dolls, LLC v. Town of Del l Prairie*, 2012 WI 76, ¶¶ 18–19, 342 Wis. 2d 350, 814 N.W.2d 690). Moreover, as the supreme court pointed out in *Nowell II*, this Court in *Nowell I* admitted that its decision " 'represent[ed] a substantial departure from ordinary judicial review of a municipality's exercise of police power.' " *See Nowell II*, 351 Wis. 2d 1, ¶ 46 (citing *Nowell I*, 344 Wis. 2d 269, ¶ 11). "A municipality's exercise of its police power has traditionally been accorded deference by reviewing courts." *Nowell II*, 351 Wis. 2d 1, ¶ 46. Thus, we disagree with Smith's contention that retroactive application would "upset a rule on which many parties reasonably relied." (Some formatting altered.)

¶ 15. Second, retroactive application would undoubtedly further the operation of the *Nowell II* rule. *See Heritage Farms, Inc.*, 339 Wis. 2d 125, ¶ 45. Smith argues that doing so is undesirable because it will require the courts to "go[] back in time and undo[] however many trial court decisions permitted taverns to remain open based on what was, at the time, indisputably binding precedent." We disagree. Retroactive application of *Nowell II* will not automatically "undo" any decisions made by the trial courts regarding mu-

787

nicipal licensing decisions that may have been decided under the *Nowell I de novo* standard. Rather, retroactive application of *Nowell II* simply means that appellate courts will review such decisions on appeal by reviewing *the municipality's* licensing decision instead of reviewing the trial court's decision. *See Questions, Inc.*, 336 Wis. 2d 654, ¶ 13 (on certiorari review, we review the decision of the municipality, not the trial court).

¶ 16. Third, retroactive application will not produce substantial inequitable results. *See Heritage Farms, Inc.*, 339 Wis. 2d 125, ¶ 45. Smith argues that "great inequity could result from retroactive application to an unknown number of tavern owners who most certainly relied on their successful *de novo* reviews," but does not explain why this is so. *See Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶ 20, 261 Wis. 2d 769, 661 N.W.2d 476 (we need not address inadequately developed arguments). Smith's argument presupposes that applying *Nowell II* automatically reverses any previous trial court decisions made under the *de novo* standard, when, for the reasons we explained above, it means only that appellate courts will review such decisions on appeal by reviewing *the municipality's* licensing decision instead of reviewing the trial court's decision. Therefore, we do not find Smith persuasive on this point.

■

¶ 17. Consequently, for the foregoing reasons, we will not review the trial court's decision, but will instead review the City of Milwaukee Common Council's decision.[2] *See id.*, 351 Wis. 2d 1, ¶¶ 3, 48; *see also Ques-*

---

[2] We also disagree with Smith's argument that if we decide that *Nowell v. City of Wausau*, 2013 WI 88, 351 Wis. 2d 1, 838

*tions, Inc.*, 336 Wis. 2d 654, ¶ 13. On certiorari review, we "accord[] a presumption of correctness and validity to the [Council's] decision," and limit our review to determining whether: (1) the Common Council's decision was within its jurisdiction; (2) the Council acted according to law; (3) the decision was arbitrary or oppressive; and (4) the evidence of record substantiates its decision. *See Nowell II*, 351 Wis. 2d 1, ¶ 24.

*(2) Application of the certiorari standard to the facts of the case requires affirming the City's nonrenewal of Smith's Class B liquor license.*

¶ 18. Smith devotes his entire brief to the issue of whether *Nowell II* should apply to our review of this case and does not, at any point, discuss whether the

N.W.2d 852 (*Nowell II*), applies retroactively the proper course is to remand the case to the trial court so that it may decide the case under the correct standard. The case on which Smith relies to support his argument, *Thompson v. Wisconsin Dep artmen t of Public Instruction*, 197 Wis. 2d 688, 702, 541 N.W.2d 182 (Ct. App. 1995), reversed and remanded a trial court's decision reviewing a decision of the State superintendent on the grounds that the superintendent applied the incorrect standard of review to the question of whether a nexus existed between a teacher's immoral conduct and the health, welfare, safety or education of any pupil, *see id.* at 693. This court remanded the matter to the superintendent so that the proper standard could be applied. *See id.* at 702. *Thompson* is inapposite because it was not the Common Council that applied the incorrect standard in reviewing Smith's case, but the trial court. *See also* WIS. STAT. § 227.57(5) ("The court shall set aside or modify *the agency action* if it finds that *the agency* has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to *the agency* for further action under a correct interpretation of the provision of law."). (Emphasis added.)

factors we must consider under the certiorari standard of review fall in his favor. Given the absence of any argument to the contrary, we could conclude our analysis here and decide that all the certiorari factors favor affirming the City's decision. *See Schonscheck*, 261 Wis. 2d 769, ¶ 20. However, we will briefly explain the reasons for our decision.

¶ 19. First, the Common Council's decision was within its jurisdiction. *See* Wis. Stat. § 125.51(1)(a) (authorizing municipalities to grant "Class B" liquor licenses); Wis. Stat. § 125.12(3) (authorizing municipalities to refuse to renew a liquor license); *Nowell II*, 351 Wis. 2d 1, ¶ 41 ("the decision to grant or deny a Class B liquor license is committed to the sound discretion of the municipal governing body").

¶ 20. Likewise, the Common Council acted according to law. *See* Wis. Stat. §§ 125.12(3), 125.12(2)(ag)2. (permitting nonrenewal of a liquor license if the premises on which liquor is sold is "disorderly or riotous"); *see also State ex rel. Ruffalo v. Common Council of the City of Kenosha*, 38 Wis. 2d 518, 526, 157 N.W.2d 568 (1968) (behavior of patrons after leaving a tavern is a factor that a municipality may consider when deciding whether to renew a liquor license).

¶ 21. In addition, the Common Council's decision was neither arbitrary nor oppressive. "[A]n agency does not act in an arbitrary . . . manner if it acts on a rational basis"; rather, "[a]rbitrary action is the result of an unconsidered, wilful or irrational choice, and not the result of the 'sifting and winnowing' process." *Van Ermen v. DHSS*, 84 Wis. 2d 57, 64–65, 267 N.W.2d 17 (1978) (citation and quotation marks omitted). As the City points out, the Common Council's decision was

based upon the License Committee's findings of fact and conclusions of law, which, as shown by this excerpt from the January 3, 2013 Licensing Committee hearing, demonstrate a winnowing and sifting of the facts —not an arbitrary or unreasonable decision:

ALDERMAN PEREZ: Yes. Thank you, Mr. Chair. I have met with the applicant. I have been out, you know, just watching the district and watching when several locations end their night and how they're dispersed of — of their clients and trying to contain that as best as possible.

I do have lots of tension and concerns, and, you know, whether it was — you know, we have one, two, three, four, five, six, seven, eight — nine items, you know; five batteries, shooting, battery, robbery, gun incident, underaged, armed robbery.

I know there's some inconsistency, or that you feel that there's some discrepancy with the report, but I think it's obvious when we hear the report, it's — there is just a pattern.

And part of you coming here today is really giving your testimony and combativeness. And I think that in the past, you've had some ten-day suspensions, and we hope things get better, and they don't seem like they have, and it's tough, it really is.

But I think you've kind of given us no choice but to think of this as a very serious matter, and there hasn't been improvement. And I think you're nice people. I have met with you. But I think some of the [improvement] now that you've done is a little too late, and because of that, I'm going to move for denial. . . .

And so based on the police report, and, you know, we actually have these, you know, incidents; Number 7; the fight, Number 9; the battery, Number 10; the shooting, 14; another battery, 15; robbery, 17; a gun

incident, Item 18; underage, and Item Number 19; an armed robbery. It's just too much. . . .

■

¶ 22. Finally, the evidence in the record substantiates the Common Council's decision. "Substantial evidence does not mean a preponderance of the evidence. Rather, the test is whether, taking into account all the evidence in the record, reasonable minds could arrive at the same conclusion as the" Common Council. *See Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶ 27, 264 Wis. 2d 200, 664 N.W.2d 651 (citation and quotation marks omitted). As noted, in addition to the emails from the neighbors requesting that Mixx's license be suspended or revoked due to recurrent loud noise and violence in and around the club, much of the evidence in this case came from the police synopsis that was read into the record at Smith's license hearing. The numerous incidents detailed in the report, some of which we include below, certainly provide substantial evidence to support the Common Council's decision:

> On March 13, 2011 at 12:45 a.m., Milwaukee police responded to 906 S. Barclay for a fight complaint. Police spoke with a security guard . . . who stated [that] a large group of . . . males entered the club and ordered a large bucket of beer to their table. Once the bucket arrived, the subjects began grabbing the bottles and slinging them at other patrons and starting fighting with the patrons. His security was overwhelmed due to the large group as the fight made its way to the rear garage of the club where patrons were not allowed. Numerous bottles were shattered and blood in the club. . . .

> On October 8, 2011 at 1:44 a.m., Milwaukee police . . . were flagged down by a subject for a battery complaint that occurred at Club Mixx. . . . The victim stated that a fight took place inside the club and that

during the fight, he ended up on the floor and was punched and kicked multiple times. Officers observed large amounts of blood coming from the victim's head. The victim was treated at an area hospital where he received three stitches to seal his right temporal artery and received more stitches in other areas where he had lacerations. Police spoke with the victim's friend who stated it was near closing time when he observed a fight and security escorting his friend, who was bleeding, out the door. . . . Police viewed video surveillance, which showed multiple fights at different locations with suspects going behind the bar. Bottles were being thrown and it also showed the victim being beaten. . . . No employee from the club called police.

On February 11, 2012 at 1:36 a.m. Milwaukee police responded to a fight complaint at 906 South Barclay Street (The Mixx Club). Upon arrival officers observed a crowd of subjects being disorderly and refusing to leave the area. Some of the subjects stated they were waiting for their coats because the coat rack had fallen and had caused a mix-up of peoples coats. The officers were not able to locate a fight or the caller. The establishment was cooperative but was unable to provide any video because the system was not working. . . .

On March 3, 2012 at 6:10 a.m. Milwaukee police responded to St. Joseph's Hospital to investigate a substantial battery complaint. A witness told officers a fight had occurred between the witness's fiancé and another subject in the area east of South 1st Street and south of East National Avenue after they had left a club called something like "Mixture" and that the fight was broken up by security guards from the club. Investigating officers believe the witness was referring to The Mixx Club at 906 South Barclay Street. . . .

On June 16, 2012 at 2:03 a.m. Milwaukee police responded to a shooting complaint at 906 South Barclay Street (The Mixx Club). The investigation revealed an

altercation began inside the bar and continued at bar close when the suspect followed two victims out to their car and shot them. One victim was shot [in] the back and one was shot [in] the right thigh. Upon arrival at the scene some the security guards that were working left before being identified or interviewed. . . .

On August 25, 2012 at 1:29 a.m. Milwaukee police responded to a battery complaint at 906 South Barclay Street (The Mixx Club). [Smith's mother] told officers a patron had been hit with a glass bottle inside the business. Officers located an individual inside the business that had an abrasion on his face. This individual refused to cooperate or provide any information and left the business after telling the officer "I don't want any help from the police." No additional reports were filed.

On September 10, 2012, a female subject walked into Milwaukee Police District #1 to report a robbery that occurred on September 8, 2012 around 2:10 a.m. in the area of 800 South Barclay Street. The victim told police unidentified subjects in a parking lot pushed her to the ground and took her purse after leaving the business at bar close. . . .

On September 16, 2012 at 2:25 a.m. Milwaukee police responded to a subject with a gun complaint at 906 South Barclay Street (The Mixx Club). The investigation revealed that a patron (Jamaal Evans) threw a handful of money into the air outside the entrance of the closed business. Several unknown females picked up the money, which Evans asked to be returned to him. When the females refused, Evans walked to his car and retrieved a black semi-auto handgun. A security guard employed by the business tackled Evans, relieved him of the gun and called police. A Milwaukee police incident report was filed.

On October 7, 2012 at 1:12 a.m. Milwaukee police were flagged down by security for The Mixx Club (906

South Barclay Street). The police officer was told that security had removed three people from the business earlier and that those same three people were now in a vehicle south of the business smoking drugs. When contact was made with the three people referred to by security, no drugs were discovered but officers learned that one of the individuals was 19 years old. This individual admitted to officers that he had been inside the business and had purchased and consumed alcohol. The officer was unable to determine who, if anyone, had checked this individual's identification. While conducting this investigation, the officer became aware of an armed robbery taking place in the parking lot.

October 7, 2012 at 1:37 a.m. a Milwaukee police officer, while investigating an underage drinking violation at 906 South Barclay Ave. (The Mixx Club), was notified of an armed robbery taking place in the parking lot. Investigation revealed a patron of the business was robbed at gunpoint while returning to his car.

(Some formatting altered and numbering omitted.)

¶ 23. In sum, our review of the record supports the conclusion that Smith does not dispute: (1) the Common Council's decision was within its jurisdiction; (2) the Council acted according to law; (3) the decision was neither arbitrary nor oppressive; and (4) the evidence of record substantiates its decision. *See Nowell II*, 351 Wis. 2d 1, ¶ 24.

¶ 24. Therefore, we reverse the trial court's decision and affirm the decision of the Common Council not to renew Smith's Class B tavern license.

*By the Court.*—Judgment reversed.